Barry I. Levy, Esq.
Frank P. Tiscione, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,
Liberty Mutual Fire Insurance Company, Liberty Insurance
Corporation, The First Liberty Insurance Corporation, LM
Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance
Company, Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco Company
of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION, THE FIRST          Docket No.:_____ (     )
LIBERTY INSURANCE CORPORATION, LM
INSURANCE CORPORATION, LIBERTY MUTUAL
MID-ATLANTIC INSURANCE COMPANY, LIBERTY           **Plaintiff Demands a Trial by**
COUNTY MUTUAL INSURANCE COMPANY, LM               **Jury**
PROPERTY and CASUALTY INSURANCE COMPANY,
SAFECO COMPANY OF INDIANA, and AMERICAN
STATES INSURANCE COMPANY,

                              Plaintiffs,

              -against-

IGOR FARBEROV, GIF CONSULTING CORP., ABV
MEDICAL SUPPLIES INC., AFFORDABLE MEDICAL
SUPPLY INC., ARGO MEDICAL EQUIPMENT CORP.,
ATLANTIC SUPPLY CORP., BALTIC SUPPLY CORP.,
GORSK MEDICAL SUPPLIES INC., GUSEYN
MEDICAL SUPPLIES INC., OMEGA MEDICAL
EQUIPMENT CORP., PROMPT DIRECT SUPPLY
CORP., SARAT MEDICAL SUPPLIES INC., SARVAT
MEDICAL SUPPLIES CORP., VITTEL MEDICAL
SUPPLIES INC., XPERT SUPPLY CORP., ZAREV
MEDICAL SUPPLIES INC., ZASTAVA MEDICAL
SUPPLIES INC., AKSANA BELIAKOUSKAYA,
JOSEPH TESLER, ALLA DODSON, OLEKSANDR
BOBRYTSKY, JOSEPH DOMOVSKY, ARON

KUPERMAN, OLEG DOMBROVSKY, MICHAEL
KARON, DAVIT GOZAKISHVILI, EUGENE PELTS,
SERGEY FEDORENKO, YELENA BALTACHI, HONA
GORDON, PAVEL BEZBORODOV, and JOHN DOE
DEFENDANTS "1-10,"

                    Defendants.

--------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against ABV Medical Supplies Inc., Affordable Medical Supply Inc., Argo Medical Equipment Corp., Atlantic Supply Corp., Baltic Supply Corp., Gorsk Medical Supplies Inc., Guseyn Medical Supplies Inc., Omega Medical Equipment Corp., Prompt Direct Supply Corp., Sarat Medical Supplies Inc., Sarvat Medical Supplies Corp., Vittel Medical Supplies Inc., Xpert Supply Corp., Zarev Medical Supplies Inc., Zastava Medical Supplies Inc. (collectively, the "DME Entities"), Aksana Beliakouskaya, Joseph Tesler, Alla Dodson, Oleksandr Bobrytsky, Joseph Domovsky, Aron Kuperman, Oleg Dombrovsky, Michael Karon, Davit Gozakishvili, Eugene Pelts, Sergey Fedorenko, Yelena Baltachi, Hona Gordon, Pavel Bezborodov (collectively, the "Paper Owner Defendants"), Igor Farberov ("Farberov"), GIF Consulting Corp. ("GIF Consulting") (the DME Entities, Paper Owner Defendants, Farberov, and GIF Consulting are collectively referred herein as the "Defendants"), and John Doe Defendants "1" through "10" (the "John Doe Defendants"), hereby allege as follows:

## INTRODUCTION

1.      Liberty Mutual brings this action to recover more than $700,000.00 that Defendants have wrongfully obtained from Liberty Mutual by submitting and causing to be submitted hundreds of fraudulent no-fault insurance charges relating to the purported dispensing of medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. lumbar-sacral supports, positioning car seats, shoulder orthoses, knee orthoses, heat pads, etc.) (collectively, the "Fraudulent Equipment") through the DME Entities, which were allegedly provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under New York no-fault insurance policies issued by Liberty Mutual ("Insureds") and to terminate an ongoing fraudulent scheme committed against Liberty Mutual by the Defendants.

2.      The billing for Fraudulent Equipment is the byproduct of a scheme perpetrated by the Paper Owner Defendants, who posed as the on-paper owners of the fifteen (15) separate DME Entities, and Farberov, who actually operated and controlled the DME Entities and who used GIF Consulting to effectuate the fraudulent scheme that involved: (i) associating and colluding with the layperson operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics"), (ii) obtaining prescriptions through the payment of kickbacks and other financial incentives for medically unnecessary DME/OD purportedly issued by healthcare providers (the "Referring Providers") who were working out of Clincs in the New York metropolitan area, and (iii) using these prescriptions for medically unnecessary DME/OD to submit billing to Liberty Mutual and the New York automobile industry with each DME Entity making common fraudulent misrepresentations regarding the type and nature of the Fraudulent Equipment in order to inflate the charges to Liberty Mutual and maximize Defendants' ill-gotten gain.  Once these prescriptions for Fraudulent Equipment were secured from more than forty-five

(45) separate No-Fault Clinics, the Defendants billed Liberty Mutual <u>via</u> the DME Entities collectively more than $2.3 million beginning in 2021.

       3.     Liberty Mutual seeks to recover more than $700,000.00 that has been wrongfully obtained by the Defendants since 2021 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $900,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the DME Entities because:

       (i)     The Defendants billed Liberty Mutual for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions issued and secured through collusive arrangements;

       (ii)     The Defendants billed Liberty Mutual for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

       (iii)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds;

       (iv)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to Liberty Mutual by Defendants fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment; and

       (v)     The Defendants billed Liberty Mutual for Fraudulent Equipment when they were not entitled to collect No-Fault Benefits because they failed to comply with local licensing requirements.

       4.     The Defendants fall into the following categories:

       (i)     The DME Entities are New York corporations that are used as the billing arm of the fraudulent scheme - they purport to purchase DME and OD from wholesalers, purport to provide Fraudulent Equipment to automobile

accident victims, and bill New York automobile insurance companies, including Liberty Mutual, for the Fraudulent Equipment;

(ii) the Paper Owner Defendants are the primary drivers of the fraudulent scheme – they are listed on paper as the owners, operators, and controllers of their respective DME Entities, when, as discussed below, Farberov secretly controls and profits from the DME Entities, and used the DME Entities to submit bills to Liberty Mutual and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii) Farberov and GIF Consulting are also the primary drivers of the fraudulent scheme – they secretly owned, operated, and/or controlled the DME Entities and colluded with the John Doe Defendants; and;

(iv) Upon information and belief, the John Doe Defendants (collectively, with Farberov and GIF Consulting, the "Management Defendants") are citizens of New York and are presently not identifiable but: (i) engaged in collusive kickback arrangements with Farberov for the provision of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to pre-determined protocols and used to maximize profits without regard for genuine patient care; (ii) include the Clinic Controllers who are associated with the No-Fault Clinics and Referring Providers which are the sources of prescriptions to the DME Entities; and/or (iii) conspired with the Paper Owner Defendants and Farberov to further the fraudulent schemes against Liberty Mutual and other automobile insurers.

5.     As discussed below, the Defendants have always known that the claims for

Fraudulent Equipment submitted to Liberty Mutual were fraudulent because:

(i) The billing submitted to Liberty Mutual and other New York automobile insurers was pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements;

(ii) The Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(iii) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to Liberty Mutual – and other New York automobile insurers – knowingly mispresented the type and nature of the Fraudulent Equipment purportedly

provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds;

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by Defendants to Liberty Mutual – and other New York automobile insurers – fraudulently and intentionally grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; and

(v)     The bills for Fraudulent Equipment submitted by the Defendants to Liberty Mutual knowingly misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they misrepresented their ownership and business premises address for each of the DME Entities.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to Liberty Mutual through the DME Entities.

7.      The charts attached hereto as Exhibits "1" through "15", set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to Liberty Mutual pursuant to the Defendants' fraudulent scheme using the DME Entities.

8.      The Defendants' fraudulent scheme began as early as 2021 and continues uninterrupted through the present day.

9.      As a result of the Defendants' fraudulent scheme, Liberty Mutual has incurred damages of more than $700,000.00.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts. Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic

Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11.     Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts. Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with its principal place of business in Boston, Massachusetts. LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.     Defendants**

15.     Defendant Aksana Beliakouskaya ("Beliakouskaya") resides in and is a citizen of New York and is listed as the on-paper owner of ABV Medical Supplies Inc. Beliakouskaya is not and has never been a licensed healthcare provider. Beliakouskaya, at all relevant times, has

been one the primary drivers of the fraudulent scheme, as she participated in a scheme with Farberov by purporting to own, operate, and control ABV Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

16.     Defendant ABV Medical Supplies Inc. ("ABV Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. ABV Supplies was incorporated on or about May 10, 2021, and is owned on paper and purportedly operated and controlled by Beliakouskaya. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from ABV Supplies and, with the aid of Beliakouskaya, used ABV Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

17.     Defendant Affordable Medical Supply Inc. ("Affordable Supply") is a New York corporation with its principal place of business in Brooklyn, New York. Affordable Supply was incorporated on or about February 2, 2022. The owner of Affordable Supply is currently unknown to Liberty Mutual as an incorporation service was used to incorporate Affordable Supply. The Management Defendants secretly operated, managed, controlled, and profited from Affordable Supply and used Affordable Supply as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

18.     Defendant Joseph Tesler ("Tesler") resides in and is a citizen of New York and is listed as the on-paper owner of Argo Medical Equipment Corp.  Tesler is not and has never been a licensed healthcare provider. Tesler, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Argo Medical Equipment Corp., associated with others not presently identifiable to

obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

19.    Defendant Argo Medical Equipment Corp ("Argo Equipment") is a New York corporation with its principal place of business in Brooklyn, New York. Argo Equipment was incorporated on or about August 23, 2021, and is owned on paper and purportedly operated and controlled by Tesler.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Argo Equipment and, with the aid of Tesler, used Argo Equipment as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

20.    Defendant Alla Dodson ("Dodson") resides in and is a citizen of New York and is listed as the on-paper owner of Atlantic Supply Corp.  Dodson is not and has never been a licensed healthcare provider. Dodson, at all relevant times, has been one the primary drivers of the fraudulent scheme, as she participated in a scheme with Farberov by purporting to own, operate, and control Atlantic Supply Corp., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

21.    Defendant Atlantic Supply Corp. ("Atlantic Supply") is a New York corporation with its principal place of business in Brooklyn, New York. Atlantic Supply was incorporated on or about January 4, 2022, and is owned on paper and purportedly operated and controlled by Dodson.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Atlantic Supply and, with the aid of Dodson, used Atlantic Supply as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

22.     Defendant Oleksandr Bobrytsky ("Bobrytsky") resides in and is a citizen of New York and is listed as the on-paper owner of Baltic Supply Corp.  Bobrystsky is not and has never been a licensed healthcare provider. Bobrytsky, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Baltic Supply Corp., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

23.     Defendant Baltic Supply Corp. ("Baltic Supply") is a New York corporation with its principal place of business in Brooklyn, New York. Baltic Supply was incorporated on or about February 16, 2021, and is owned on paper and purportedly operated and controlled by Bobrytsky. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Baltic Supply and, with the aid of Bobrytsky, used Baltic Supply as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

24.     Defendant Joseph Domovsky ("Domovsky") resides in and is a citizen of New York and is listed as the on-paper owner of Gorsk Medical Supplies Inc.  Domovsky is not and has never been a licensed healthcare provider. Domovsky, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Gorsk Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

25.     Defendant Gorsk Medical Supplies Inc. ("Gorsk Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Gorsk Supplies was

incorporated on or about March 15, 2023, and is owned on paper and purportedly operated and controlled by Domovsky.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Gorsk Supplies and, with the aid of Domovsky, used Gorsk Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

26.     Defendant Aron Kuperman ("Kuperman") resides in and is a citizen of New York and is listed as the on-paper owner of Guseyn Medical Supplies Inc.  Kuperman is not and has never been a licensed healthcare provider. Kuperman, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Guseyn Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

27.     Defendant Guseyn Medical Supplies Inc. ("Guseyn Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Guseyn Supplies was incorporated on or about July 7, 2023, and is owned on paper and purportedly operated and controlled by Kuperman.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Guseyn Supplies and, with the aid of Kuperman, used Guseyn Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

28.     Defendant Oleg Dombrovsky ("Dombrovsky") resides in and is a citizen of New York and is listed as the on-paper owner of Omega Medical Equipment Corp.  Dombrovsky is not and has never been a licensed healthcare provider. Dombrovsky, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by

purporting to own, operate, and control Omega Medical Equipment Corp., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

29.    Defendant Omega Medical Equipment Corp. ("Omega Equipment") is a New York corporation with its principal place of business in Brooklyn, New York. Omega Equipment was incorporated on or about June 15, 2022, and is owned on paper and purportedly operated and controlled by Dombrovsky. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Omega Equipment and, with the aid of Dombrovsky, used Omega Equipment as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

30.    Defendant Michael Karon ("Karon") resides in and is a citizen of New York and is listed as the on-paper owner of Prompt Direct Supply Corp. Karon is not and has never been a licensed healthcare provider. Karon, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Prompt Direct Supply Corp., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

31.    Defendant Prompt Direct Supply Corp. ("Prompt Direct Supply") is a New York corporation with its principal place of business in Brooklyn, New York. Prompt Direct Supply was incorporated on or about June 15, 2022, and is owned on paper and purportedly operated and controlled by Karon. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Prompt Direct Supply and, with the aid of Karon, used Prompt Direct

Supply as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

32.    Defendant Davit Gozakishvili ("Gozakishvili") resides in and is a citizen of New York and is listed as the on-paper owner of Sarat Medical Supplies Inc.  Gozakishvili is not and has never been a licensed healthcare provider. Gozakishvili, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Sarat Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

33.    Defendant Sarat Medical Supplies Inc. ("Sarat Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Sarat Supplies was incorporated on or about February 11, 2023, and is owned on paper and purportedly operated and controlled by Gozakishvili.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Sarat Supplies and, with the aid of Gozakishvili, used Sarat Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

34.    Defendant Eugene Pelts ("Pelts") resides in and is a citizen of New York and is listed as the on-paper owner of Sarvat Medical Supplies Inc.  Pelts is not and has never been a licensed healthcare provider. Pelts, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Sarvat Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used

those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

35.      Defendant Sarvat Medical Supplies Corp. ("Sarvat Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Sarvat Supplies was incorporated on or about September 15, 2023, and is owned on paper and purportedly operated and controlled by Pelts. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Sarvat Supplies and, with the aid of Pelts, used Sarvat Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

36.      Defendant Sergey Fedorenko ("Fedorenko") resides in and is a citizen of New York and is listed as the on-paper owner of Vittel Medical Supplies Inc.  Fedorenko is not and has never been a licensed healthcare provider. Fedorenko, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Vittel Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

37.      Defendant Vittel Medical Supplies Corp. ("Vittel Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Vittel Supplies was incorporated on or about March 27, 2024, and is owned on paper and purportedly operated and controlled by Fedorenko.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Vittel Supplies and, with the aid of Fedorenko, used Vittel Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

38.     Defendant Yelena Baltachi ("Baltachi") resides in and is a citizen of New York and is listed as the on-paper owner of Xpert Supply Corp.  Baltachi is not and has never been a licensed healthcare provider. Baltachi, at all relevant times, has been one the primary drivers of the fraudulent scheme, as she participated in a scheme with Farberov by purporting to own, operate, and control Xpert Supply Corp., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

39.     Defendant Xpert Supply Corp. ("Xpert Supply") is a New York corporation with its principal place of business in Brooklyn, New York. Xpert Supply was incorporated on or about July 22, 2021, and is owned on paper and purportedly operated and controlled by Baltachi.  In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Xpert Supply and, with the aid of Baltachi, used Xpert Supply as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

40.     Defendant Hona Gordon ("Gordon") resides in and is a citizen of New York and is listed as the on-paper owner of Zarev Medical Supplies Inc.  Gordon is not and has never been a licensed healthcare provider. Gordon, at all relevant times, has been one the primary drivers of the fraudulent scheme, as she participated in a scheme with Farberov by purporting to own, operate, and control Zarev Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

41.     Defendant Zarev Medical Supplies Inc. ("Zarev Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Zarev Supplies was

incorporated on or about March 6, 2024, and is owned on paper and purportedly operated and controlled by Gordon. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Zarev Supplies and, with the aid of Gordon, used Zarev Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

42.     Defendant Pavel Bezborodov ("Bezborodov") resides in and is a citizen of New York and is listed as the on-paper owner of Zastava Medical Supplies Inc. Bezborodov is not and has never been a licensed healthcare provider. Bezborodov, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with Farberov by purporting to own, operate, and control Zastava Medical Supplies Inc., associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to Liberty Mutual and other New York automobile insurance companies for the Fraudulent Equipment.

43.     Defendant Zastava Medical Supplies Inc. ("Zastava Supplies") is a New York corporation with its principal place of business in Brooklyn, New York. Zastava Supplies was incorporated on or about November 3, 2022, and is owned on paper and purportedly operated and controlled by Bezborodov. In actuality, the Management Defendants secretly operated, managed, controlled, and profited from Zastava Supplies and, with the aid of Bezborodov, used Zastava Supplies as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

44.     Defendant Farberov resides in and is a citizen of New York.

45.     Defendant GIF Consulting is a New York corporation with its principal place of business in Brooklyn, New York. GIF Consulting was incorporated on or about April 15, 2021. Defendant Farberov is the corporation's owner and sole shareholder.

46.     Upon information and belief, the John Doe Defendants reside in and are citizens of New York. The John Doe Defendants are individuals and entities presently not identifiable by Liberty Mutual.

47.     GIF Consulting, Farberov, and the John Doe Defendants are individuals and entities who are not and never have been licensed healthcare professionals, who knowingly participated in the fraudulent scheme by: (i) secretly operating, managing, and/or controlling the DME Entities; (ii) coordinating with others to unlawfully operate, manage, and/or control the  No-Fault Clinics; (iii) establishing relationships with other laypersons associated with the No-Fault Clincs; (iv) engaging in illegal financial arrangements to obtain prescriptions for the Fraudulent Equipment that were purportedly issued by the Referring Providers; (v) implementing and directing the fraudulent, pre-determined prescription protocols pursuant to which the Fraudulent Equipment was purportedly prescribed; and (vi) profiting from the fraudulent scheme.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

49.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

50.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

51.     Liberty Mutual underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

52.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

53.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

54.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

55.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

56.     Pursuant to the No-Fault Laws, healthcare service providers are not entitled to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

57.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

58.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

59.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to Liberty Mutual, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

60.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## B.     Pertinent Regulations Governing No-Fault Benefits, DME and OD

61.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

62.     Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the

patient such financial relationship: . . . (b) a compensation arrangement". <u>See</u> N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist". <u>See</u> N.Y. P.H.L. § 238(11).

63.    A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which are DME suppliers such as the DME Entities. <u>See</u> N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. <u>See</u> N.Y. P.H.L. § 238-a(5)(a).

64.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, infrared heat lamps, lumbar cushions, orthopedic car seats, cervical traction units, and whirlpool baths.

65.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

66.    Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

67.    Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of

Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is

defined as "a person who has a physical or medical impairment resulting from anatomical or

physiological conditions which prevents the exercise of a normal bodily function or is

demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY §

2-271; NYC Admin. Code §20-425.

68.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or

adjusting of products for the disabled within the City of New York without a Dealer in Products

License.  See NYC Admin. Code §20-426.

69.     A Dealer in Products License is obtained by filing a license application with the

DCWP. The application requires that the applicant identify, among other pertinent information,

the commercial address of where the DME/OD supplier is physically operating from.

70.     The license application for a Dealer in Products License also requires the applicant

to affirm that they are authorized to complete and submit the application on behalf of the corporate

entity seeking a license and that the information contained in the application is true, correct, and

complete. The affirmation to the application requires a signature that is made under penalty for

false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

71.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not

artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted

by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

72.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical

Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds

by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having
> assigned his rights to a provider in good faith, would have DME items of inflated
> fees constituting a disproportionate share of benefits, be deducted from the amount

of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

73.    As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

(a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

74.    As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

75.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

76.    For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

77.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.

78.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as Liberty Mutual to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

79.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

80.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items that are identified by HCPCS Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

81.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

82.     In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York

State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

83.    Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

84.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    The DME Entities' Common Secret Ownership

85.    Beginning in 2021 and continuing through the present day, Defendants masterminded and implemented a complex fraudulent scheme in which the DME Entities were used consecutively and in conjunction with each other to bill Liberty Mutual and other New York

automobile insurers millions of dollars in No-Fault benefits to which they were never entitled to receive.

86.     Starting in or around 2021, the Management Defendants began recruiting the Paper Owner Defendants, who were willing to pose as the on-paper owners of the respective DME Entities to mask that the DME Entities were not separate and independent businesses, but were rather part of a common scheme whereby the Management Defendants operated and controlled the DME Entities to submit billing for Fraudulent Equipment to Liberty Mutual.

87.     As part of the Defendants' efforts to avoid detection of their common scheme and maximize the amount of billing they could submit to Liberty Mutual, different DME Entities were "partnered" with certain No-Fault Clinics so that the DME Entities could bill for Fraudulent Equipment in parallel with each other.

88.     To further convolute the scheme, the DME Entities also billed for Fraudulent Equipment in a consecutive manner, limiting any single DME Entity's billing to less than a year:

| **DME Entity** | **Billing Start** | **Billing End** |
|---|---|---|
| Baltic Supply | March 30, 2021 | August 16, 2021 |
| Prompt Direct Supply | April 7, 2021 | August 27, 2021 |
| ABV Supplies | May 25, 2021 | November 9, 2021 |
| Xpert Supply | August 23, 2021 | February 9, 2022 |
| Argo Equipment | August 30, 2021 | December 20, 2021 |
| Affordable Supply | January 27, 2022 | May 17, 2022 |
| Omega Equipment | July 7, 2022 | January 16, 2023 |
| Zastava Supplies | January 12, 2023 | December 19, 2023 |
| Gorsk Supplies | March 28, 2023 | February 12, 2024 |

| Guseyn Supplies | November 28, 2023 | June 12, 2024 |
| Sarat Supplies | December 26, 2023 | June 5, 2024 |
| Zarev Supplies | April 10, 2024 | August 13, 2024 |
| Sarvat Supplies | May 20, 2024 | September 30, 2024 |
| Vittel Supplies | August 19, 2024 | November 13, 2024 |

89. Between March 2021 and present, the Management Defendants used the DME Entities as vehicles to submit fraudulent billing to Liberty Mutual and other insurers. In that time period, the Management Defendants used the DME Entities to submit more than $2.3 million in fraudulent billing to Liberty Mutual. The Management Defendants determined that billing for the Fraudulent Services should be divided between the DME Entities in an effort to limit the amount of billing submitted through any one entity or tax identification number.

90. While each of the DME Entities were formed and listed as being owned by one of the Paper Owner Defendants, all of the DME Entities were actually controlled by the Management Defendants, who profited from the fraudulent scheme committed against Liberty Mutual and other New York automobile-insurers.

91. The DME Entities are each tied to the Management Defendants either: (i) by way of payments made to GIF Consulting; or (ii) because their incorporation address is listed as 2667 Coney Island Ave., Brooklyn NY (the "Coney Island Ave. Address"). The Coney Island Ave. Address is linked to Farberov as during a SIU site inspection there, investigators observed a mailbox with the name "Igor Farberov" on it.

92. The following DME Entities issued checks to GIF Consulting purportedly for consulting work, totaling over $480,000.00:

| **DME Entity** | **Total Payments to GIF Consulting** |
| --- | --- |
| ABV Medical Supplies | $195,229.00 |
| Atlantic Supply | $65,788.00 |
| Affordable Supply | $65,000.00 |
| Xpert Supply | $59,365.00 |
| Baltic Supply | $44,500.00 |
| Zastava Supplies | $40,000.00 |
| Omega Equipment | $9,716.00 |
| Argo Equipment | $1,824.00 |
| Prompt Direct Supply | $930.00 |

93.     Based on Liberty Mutual's site inspection of the Coney Island Ave. Address, the following additional DME Entities were identified as also being tied to Farberov and the Management Defendants, with each entity listing the Coney Island Ave. Address on their incorporation paperwork:

| **DME Entity** | **Incorporation Address** |
| --- | --- |
| Gorsk Supplies | 2667 Coney Island Ave., Brooklyn NY |
| Guseyn Supplies | 2667 Coney Island Ave., Brooklyn NY |
| Sarat Supplies | 2667 Coney Island Ave., Brooklyn NY |
| Sarvat Supplies | 2667 Coney Island Ave., Brooklyn NY |
| Vittel Supplies | 2667 Coney Island Ave., Brooklyn NY |
| Zarev Supplies | 2667 Coney Island Ave., Brooklyn NY |

94.     The Management Defendants at all relevant times maintained complete control over the DME Entities' billing, collections, and revenues realized, which they siphoned to themselves or used for the payment of kickbacks to further the fraudulent scheme.

95.     The scheme perpetrated by the Management Defendants also expanded to their control over physical therapy practices and pharmacy providers that were all associated with the No-Fault Clinics from which the DME Entities received prescriptions for Fraudulent Equipment. In fact, GIF Consulting received over $800,000.00 in payments from seventeen (17) different physical therapy practices and over $100,000.00 from two (2) different pharmacies.

96.     In addition, GIF Consulting received and/or paid monies to numerous "consulting" entities even though they purported to be a consulting entity for which they received "consulting" fees from the DME Entities.  In fact, one of the entities GIF Consulting received monies from was Oliver Consulting LLC, an entity owned by Lance Grody. Both Oliver Consulting LLC and Grody have been sued on multiple occasions for insurance fraud. See e.g., Government Employees Insurance Company, et al. v. Grody, et al., 22-cv-03598 (BMC) (E.D.N.Y. 2022); Government Employees Insurance Company, et al. v. Konata Solomon Stallings (A Sole Proprietorship), et al., 22-cv-06306 (DG)(RML) (E.D.N.Y. 2022); Government Employees Insurance Company, et al. v. Grody, et al., 24-cv-06187 (RER)(PK) (E.D.N.Y. 2024).

97.     GIF Consulting also paid significant monies to Eugene Nemets and Alla Burdina. Eugene Nemets and his DME entity, Longevity Medical Supply, Inc., were previously sued for insurance fraud. See, Gov't Emps. Ins. Co., et al. v. Longevity Medical Supply, Inc., et al., 15-cv-03996 (MKB)(JO) (E.D.N.Y. 2015); Allstate Ins. Co., et al. v. Amirova, et al., 19-cv-02354 (EK) (LB) (E.D.N.Y. 2019); Gov't Emps. Ins. Co., et al. v. Longevity Medical Supply, Inc., et al., 20-cv-01681 (RPK) (VMS) (E.D.N.Y. 2020). Upon information and belief, Alla Burdina is the daughter-in-law of Gregory Mikhalov, a layperson who was indicted and later pled guilty to

illegally controlling and owning healthcare providers and no-fault clinics, including numerous No-Fault Clinics utilized by the DME Entities. See, USA v. Zemlyansky, et al., 12-cr-00171 (JPO) (S.D.N.Y. 2012).

98.    In addition, the Management Defendants arranged for the DME Entities to pay kickbacks in exchange for medically unnecessary prescriptions for Fraudulent Equipment purportedly issued by Referring Providers at the No-Fault Clinics.

99.    The Management Defendants used their control over the DME Entities to permit them to: (i) control the day-to-day operations and exercise supervisory authority over; and (ii) siphon to themselves the profits that were generated by the billings submitted to Liberty Mutual and other insurers through the DME Entities.

100.    In reality, the Paper Owner Defendants have never been in control of the DME Entities. At best, the Paper Owner Defendants have been nothing more than de facto employees of the Management Defendants.

**B.    Overview of the Defendants' Common Fraudulent Scheme**

101.    The Management Defendants, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Entities as vehicles to bill Liberty Mutual and other New York automobile insurers for millions of dollars in No-Fault Benefits which Defendants were never entitled to receive.

102.    As part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various No-Fault Clinics.

103.    None of the DME Entities marketed or advertised to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

104.    Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

105.    Instead, the Defendants entered into collusive agreements with the John Doe Defendants who were associated with both the Clincs and the Referring Providers whereby kickbacks and other financial incentives were paid so that Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the Clinics.

106.    The prescriptions obtained by the Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, they were routed directly to the Defendants at the direction of the Clinic Controllers to ensure that the Insureds did not attempt to fill the prescriptions with legitimate DME and OD retailers, who would likely question the legitimacy of the prescriptions, the volume of prescriptions, or the need for the DME/OD in the first instance.

107.    The prescriptions obtained by the Defendants for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which the Defendants used (i) as a basis to purportedly provide and bill for whatever DME/OD the Defendants decided to dispense, not what was determined based upon a legitimate prescriptions by a licensed healthcare processional; (ii) to misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like Liberty Mutual; and (iii) to misrepresent the maximum reimbursement rate they were entitled to receive for Non-Fee Schedule items.

108.    By submitting bills to Liberty Mutual seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

109.    However, the Defendants tried to maximize the amount of No-Fault Benefits that they could obtain from Liberty Mutual, and other automobile insurers, by submitting bills to Liberty Mutual for Fraudulent Equipment that was never actually provided to Insureds by misrepresenting the HCPCS Codes identified in the bills submitted to Liberty Mutual by the Defendants.

110.    Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Defendants.

111.    Similarly, the Defendants misrepresented the maximum reimbursement amounts they were entitled to in their billing submissions to Liberty Mutual for Non-Fee Schedule DME, resulting in drastically inflated bills to Liberty Mutual.

112.    After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, the Defendants in turn then billed Liberty Mutual for: (i) Fraudulent Equipment that was not reasonable nor medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to Liberty Mutual; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to Liberty Mutual's Insureds.

**C.      The Fraudulent Scheme - Predetermined Fraudulent Protocols Associated with the Prescriptions**

113.    The Defendants were able to obtain prescriptions that could be used as a basis to submit bills to Liberty Mutual through predetermined fraudulent protocols that were established between and among the Defendants, the Clinic Controllers and other John Defendants, and the Referring Providers.

114.    Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat and/or benefit the Insureds.

115.    As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrate a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds post-accident condition.

116.    Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" - "15" were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

117.    Concomitantly, almost none of the Insureds identified in Exhibits "1" - "15", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

118.    In keeping with the fact that the Insureds identified in Exhibits "1" - "15" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

119.    To the extent the Insureds in the claims identified in Exhibits "1" - "15" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

120.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar prescription protocols for numerous pieces of Fraudulent Equipment that were not medically unnecessary.

121.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

122.    For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

123.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" - "15" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

124.    For example, the predetermined fraudulent protocols at each Clinic (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation, and (ii) were not based upon what was medically necessary for each patient.  Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

125.    In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols at the various Clinics that were the prescription sources for the Defendants.

126.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

127.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider may – but generally does not – prescribe DME and/or OD.

128.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

129.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

130.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report –

whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically addressed so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

131.    It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" - "15" who were treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

132.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" - "15" who were treated by different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

133.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" - "15" that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

134.    To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill Liberty Mutual for the charges identified in Exhibits "1" - "15".

135.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" - "15", the Defendants falsely represented that the Fraudulent Equipment was

provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme

### 1. Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions

136.    To obtain access to Insureds as part of their fraudulent scheme and maximize the No-Fault Benefits the Defendants could obtain from Liberty Mutual and other New York automobile insurers, the Defendants entered into collusive agreements with others who are not presently identifiable but who are associated with the No-Fault Clinics where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

137.    Since the inception of the fraudulent scheme, the Defendants engaged in collusive financial arrangements with the Clinic Controllers to obtain prescriptions for Fraudulent Equipment that were not medically necessary. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to Liberty Mutual and other New York automobile insurers in New York.

138.    The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to Liberty Mutual and other automobile insurers.   But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the DME Entities to purportedly fill.

139.    For example, due to these collusive financial arrangements, Affordable Supply received prescriptions for Fraudulent Equipment and began billing Liberty Mutual for dates of service beginning on January 27, 2022, which was *six days before* they were incorporated on February 2, 2022.

140.    Absent the Defendants' collusive financial arrangements, it would have been impossible for Affordable Supply to have received prescriptions for Fraudulent Equipment from the No-Fault Clinics prior to ever having been formed as a corporate entity.

141.    Upon information and belief, the Referring Providers were compensated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insureds and independently bill Liberty Mutual), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including the DME Entities, rather than given to the Insureds or to a bona-fide DME/OD retailer, who would likely question its legitimacy.

142.    The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions, issued without a specific disclosure to the patient of the financial relationship between the Referring Provider and the DME Entity, are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d.  No such disclosures required by Public Health Law § 238-d were ever made to the Insureds identified in Exhibits "1"–"15".  Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Referring Providers were concealed from the Insureds

143.    As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME /OD retailer) were given the illegitimate prescriptions, which (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual

need; (ii) contained a photocopied signature of the Referring Provider; (iii) contained a photocopied Official New York State Prescription with serial number; and/or (vi) were issued on a date the Referring Provider did not treat or otherwise examine the Insured.

144. In contrast to bona fide DME/OD retailers, the Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions to support their charges to Liberty Mutual and other automobile insurers

145. The No-Fault Clinics provided facilities for the Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

146. In fact, at many of the No-Fault Clinics, Liberty Mutual received billing from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

147. Based on the collusive financial arrangements established between the Defendants and the No-Fault Clinics, the DME Entities received prescriptions for Fraudulent Equipment from the following locations:

| | |
|---|---|
| 1 Fulton Ave. Hempstead, New York | 1 Cross Island Plaza Rosedale, New York |
| 1100 Pelham Parkway Bronx, New York | 1200 Waters Place Bronx, New York |
| 1339 E Gun Hill Rd. Bronx, New York | 146 Empire Blvd. Brooklyn, New York |
| 15 Ocean Ave. Brooklyn, New York | 150 Graham Ave. Brooklyn, New York |
| 1568 Ralph Ave. Brooklyn, New York | 160-59 Rockaway Blvd. Jamaica, New York |

| 1611 East New York Ave. | 1650 Eastern Pkwy. |
| Brooklyn, New York | Brooklyn, New York |
| 175 Fulton Ave. | 175-20 Hillside Ave. |
| Hempstead, New York | Jamaica, New York |
| 1767 Southern Blvd. | 1849 Utica Ave. |
| Bronx, New York | Brooklyn, New York |
| 1894 Eastchester Rd. | 1975 Flatbush Ave. |
| Bronx, New York | Brooklyn, New York |
| 1975 Linden Boulevard | 2088B Flatbush Ave. |
| Elmont, New York | Brooklyn, New York |
| 222-01 Hempstead Ave. | 2354 Westchester Ave. |
| Queens, New York | Bronx, New York |
| 2422 Knapp St. | 2488 Grand Concourse |
| Brooklyn, New York | Bronx, New York |
| 2558 Holland Ave. | 2673 Atlantic Avenue |
| Bronx, New York | Brooklyn, New York |
| 282-284 Avenue X | 3027 Avenue V |
| Brooklyn, New York | Brooklyn, New York |
| 3041 Avenue U | 30-55 3rd Ave. |
| Brooklyn, New York | Bronx, New York |
| 318 Warren St. | 3250 Westchester Ave. |
| Brooklyn, New York | Bronx, New York |
| 332 E 149th St. | 3626 Bailey Ave. |
| Bronx, New York | Bronx, New York |
| 3910 Church Ave. | 4104 Farragut Rd. |
| Brooklyn, New York | Brooklyn, New York |
| 430 W Merrick Rd. | 552 E 180th St. |
| Valley Stream, New York | Bronx, New York |
| 560 Prospect Ave. | 60 Belmont Ave. |
| Bronx, New York | Brooklyn, New York |
| 611 East 76th Street | 652 East Fordham Road |
| Brooklyn, New York | Bronx, New York |
| 71 S. Central Ave. | 717 – 719 Southern Boulevard |
| Valley Stream, New York | Bronx, New York |
| 79-45 Metropolitan Avenue | 80-12 Jamaica Ave. |
| Queens, New York | Woodhaven, New York |
| 82-17 Woodhaven Blvd. | 90-16 Sutphin Boulevard |
| Ridgewood, New York | Jamaica, New York |

148.    As a result of these kickbacks for prescriptions arrangements, Defendants accessed

patients from the No-Fault Clinic locations, where the DME Entities received a steady volume of

prescriptions for Fraudulent Equipment through no legitimate efforts of their own.

149.    At many of the No-Fault Clinics, unlicensed laypersons, rather than healthcare

professionals, created and controlled the patient base and dictated fraudulent treatment and

prescriptions protocols according to predetermined treatment protocols which were used to maximize profits without regard to actual patient care.

150.    Not surprisingly, many of these same No-Fault Clinics were locations where the Management Defendants also purported to operate physical therapy practices, including from the follow No-Fault Clinic locations: (i) 1 Fulton Ave., Hempstead; (ii) 1100 Pelham Pkwy., Bronx; (iii) 160-59 Rockaway Blvd., Jamaica; (iv) 1611 E. New York Ave., Brooklyn; (v) 1975 Linden Blvd., Elmont; (vi) 222-01 Hempstead Ave., Queens; (vii) 2488 Grand Concourse, Bronx; (viii) 282-284 Ave. X, Bronx; (ix) 3027 Ave. V, Brooklyn; (x) 3041 Ave. U, Brooklyn; (xi) 3910 Church Ave., Brooklyn; (xii) 611 E 76th St., Brooklyn; (xiii) 652 E Fordham Rd., Bronx; (xiv) 717 Southern Boulevard, Bronx; (xv) 79-45 Metropolitan Ave., Queens; and (xvi) 90-16 Sutphin Blvd., Jamaica.

151.    In keeping with the fact that unlicensed laypersons controlled many of the No-Fault Clinics and that the Paper Owner Defendants, DME Entities, and Management Defendants engaged in collusive kickbacks in exchange for medically unnecessary prescriptions, several No-Fault Clinics were identified in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y. 2019) ("USA v. Rose") as being controlled by laypersons and receiving patients as a result of collusive kickback and referral arrangements.

152.    In USA v. Rose, numerous individuals were indicted in November 2019 for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information. To exploit the patient information, Anthony Rose ("Rose"), the ringleader of the scheme, set up a fully staffed call center in order to contact the patients and to steer them to a preferred network of medical clinics (and lawyers) in New York and New Jersey. Specifically, the medical clinics, including several No-Fault Clinics which were the source of prescriptions for Fraudulent

Equipment routed to the DME Entities, were deemed preferred because the clinic controllers paid Rose kickbacks in exchange for the referrals.

153.    A series of Government affidavits filed in support of surveillance warrants, including wiretaps, were unsealed in <u>USA v. Rose</u>. These affidavits detail the massive scope of the patient brokering scheme, reveal the identity of numerous layperson controllers and fraudulent clinic locations, and expressly implicate several No-Fault Clinics where the DME Entities received prescriptions from. <u>See USA v. Rose</u>, ECF No. 398.

154.    In particular, the Government affidavits unsealed in <u>USA v. Rose</u> include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, patients were steered to clinics located at 3910 Church Avenue, Brooklyn and 717 Southern Boulevard, Bronx – two of the No-Fault Clinic locations from which the DME Entities received prescriptions for Fraudulent Equipment.

155.    Moreover, additional laypersons have been the subject of federal criminal indictments for activity taken at various No-Fault Clinics, including Peter Khaim a/k/a Peter Khaimov, Roman Israilov and Alexander Gulkarov. <u>See</u> <u>USA v. Khaim, et al.</u>, 1:20-cr-00580 (E.D.N.Y.2020); <u>see</u> <u>also</u> <u>USA v. Gulkarov, et al.</u>, 1:22-cr-00020 (S.D.N.Y. 2022). These locations include 3910 Church Avenue, Brooklyn and 717 Southern Boulevard, Bronx.

156.    Further, multiple physicians averred that they did not authorize and/or submit billing for a variety of healthcare services purportedly performed at certain No-Fault Clinics, and further affirmed at least some of these locations are controlled and/or operated by non-medical laypeople.

157.    The No-Fault Clinics willingly provided access to Defendants in exchange for kickbacks and other financial incentives because the No-Fault Clinics were facilities that sought

to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to high volumes of Insureds at the locations.

158.    In order to obtain access to the No-Fault Clinics' patient base (i.e., Insureds), Defendants entered into collusive kickback and referral arrangements with unlicensed persons and/or healthcare professionals who "brokered" or "controlled" access to patients treated, or purported to be treated, at the No-Fault Clinics.

159.    In support of the fact that the prescriptions for Fraudulent Equipment were the result of these collusive financial arrangements, and as explained in detail below, the prescriptions were not medically necessary, were provided pursuant to predetermined fraudulent protocols set forth at each Clinic that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and included prescriptions for Fraudulent Equipment never actually issued by the Referring Provider.

160.    Based on these financial arrangements, the DME Entities received prescriptions from the No-Fault Clinics that contained photocopied signatures of the Referring Provider.

161.    For example, ABV Supplies, Gorsk Supplies, Guseyn Supplies, Sarat Supplies, Sarvat Supplies, and Zastava Supplies each received multiple sets of photocopied prescriptions from the No-Fault Clinic located at 2354 Westchester Ave., Bronx, New York for Fraudulent Equipment:

Example 1: Photocopied Prescriptions of Jordan Fersel, M.D.:

| Prescription: | Sample photocopied signatures |
|---|---|
| Zastava Supplies for Insured NM dated 4/24/2023 | Jordan Fersel, MD LIC# 162725 NPI# 18311685519    JORDAN FERSEL, MD PC JORDAN FERSEL, MD – NPI# 18311685519 |

| | |
|---|---|
| Gorsk Supplies for Insured AB dated 7/17/2023 | Jordan Fersel, MD<br>LIC# 162725<br>NPI# 18811685519 |
| Sarat Supplies for Insured JK dated 2/8/2024 | Jordan Fersel, MD<br>LIC# 162725<br>NPI# 18811685519 |
| Guseyn Supplies for Insured JR dated 4/29/2024 | Jordan Fersel, MD<br>LIC# 162725<br>NPI# 18811685519 |
| Sarvat Supplies for Insured CH dated 5/20/2024 | Jordan Fersel, MD<br>LIC# 162725<br>NPI# 18811685519 |

Example 2: Photocopied Prescriptions of Jeremie Rachunow, M.D.

| Prescription: | Sample photocopied signatures |
|---|---|
| ABV Supplies for Insured NR dated 6/15/2021 | Jeremie Rachunow, MD<br>LIC# 220017<br>NPI# 1518978634 |
| ABV Supplies for Insured AH dated 6/15/2021 | Jeremie Rachunow, MD<br>LIC# 220017<br>NPI# 1518978634 |

| | |
|---|---|
| ABV Supplies for Insured AH dated 6/15/2021 (Prescription 2) | *Jeremie Rachunow, MD*<br>*LIC# 220017*<br>*NPI# 1518978634* |

Example 3: Photocopied Prescriptions of Neil Salka, D.C.

| Prescription: | Sample photocopied signatures |
|---|---|
| Zastava Supplies for Insured FO dated 5/25/2023 | Neil Salka, DC<br>LIC# X-002749-01<br>NPI# 150818636 |
| Zastava Supplies for Insured SA dated 5/25/2023 | Neil Salka, DC<br>LIC# X-002749-01<br>NPI# 150818636 |

162.    Similarly, Argo Equipment and Omega Equipment each received multiple sets of photocopied prescriptions from the No-Fault Clinic located at 3041 Avenue U, Brooklyn, New York for Fraudulent Equipment:

Example 1: Photocopied Prescriptions of Natalia Feldman, N.P.

| Prescription: | Sample photocopied signatures |
|---|---|
| Argo Equipment for Insured AB dated 8/13/2021 | Massager<br>Natalia Feldman<br>NY Lic #: F 345 699 |

| | |
|---|---|
| Argo Equipment for Insured AB dated 8/13/2021 (Prescription 2) | ___ Massager ___<br><br>Natalia Feldman<br>NY Lic #: |
| Argo Equipment for Insured MD dated 8/14/2021 | ___ Massager ___<br><br>Natalia Feldman<br>NY Lic #: |

Example 2: Photocopied Prescriptions of Osewa Olatokunbo, F.N.P.

| **Prescription:** | **Sample photocopied signatures** |
|---|---|
| Omega Equipment for Insured ND dated 11/13/2022 | NY Lic #: 348877 |
| Omega Equipment for Insured BO dated 12/7/2022 | NY Lic #: 348877 |
| Omega Equipment for Insured GT dated 12/12/2022 | NY Lic #: 348877 |

| Omega Equipment for Insured JV dated 12/19/2022 |  |
| --- | --- |

163.   Further, John Doe Defendants associated with the No-Fault Clinic located at 1975 Flatbush Ave., Brooklyn illegally duplicated the Official New York State Prescription Pad of Ashra K. Salem, M.D. and photocopied prescriptions that had the unique barcode identifiers "0THK3S 85", "0THK3S 89", and "0THK3S 90", then used these photocopies to issue prescriptions for Fraudulent Equipment which were routed to ABV Supplies and Guseyn Supplies:

Example 1: Photocopied Prescription No. 0THK3S 85

| **Prescription:** | **Sample photocopied prescription** |
| --- | --- |
| ABV Supplies for Insured RC dated 6/17/2021 | |

| | |
|---|---|
| ABV Supplies for Insured IM dated 6/17/2021 |  |
| ABV Supplies for Insured DM dated 6/17/2021 | |

Example 2: Photocopied Prescription No. 0THK3S 89

| **Prescription:** | **Sample photocopied prescription** |
|---|---|

| Guseyn Supplies for Insured EZ dated 1/11/2024 |  |
| Guseyn Supplies for Insured KT dated 2/8/2024 | |
| Guseyn Supplies for Insured KH dated 2/8/2024 | |

Example 3: Photocopied Prescription No. 0THK3S 90

| **Prescription:** | **Sample photocopied prescription** |
|---|---|
| Guseyn Supplies for Insured SG dated 1/18/2024 |  |
| Guseyn Supplies for Insured KT dated 3/28/2024 |  |
| Guseyn Supplies for Insured KA dated 3/28/2024 |  |

164.    These are only representative examples of the photocopied prescriptions used by the Defendants as a result of their collusive financial arrangements with the No-Fault Clinics.

165.    Further, the Defendants received virtually identical predetermined sets of prescriptions from multiple Referring Providers operating out of the same No-Fault Clinic and obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

166.    Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from the Defendants.

167.    In addition, multiple Insureds were issued prescriptions for Fraudulent Equipment on a date that the Insured was not treated by the Referring Provider who purportedly issued the prescription.

168.    In all of the claims identified in Exhibits "1" through "15", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore entitled to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

169.    The Defendants' "success" in generating profits was the product of these improper financial and referral arrangements, rather than through any legitimate means, and enabled them to purportedly receive prescriptions for Fraudulent Equipment and bill Liberty Mutual through the different DME Entities to maximize billing while, at the same time, making it harder for Liberty Mutual to detect the totality of the Defendants' fraudulent scheme.

### 2.    The Predetermined Fraudulent Prescription Protocols at the Clinics

170.    Through their collusive arrangements with the John Doe Defendants, Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent

Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Clinics pursuant to predetermined fraudulent protocols, which serves to further illustrate Defendants' fraudulent scheme.

171.    The Insureds identified in Exhibits "1" - "15" that were prescribed Fraudulent Equipment from the Clinics were typically involved in minor "fender-bender" motor vehicle accidents and then purportedly treated by a variety of healthcare providers at the Clinics.

172.    However, during the course of their treatment at the Clinics, the Insureds were regularly prescribed Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was issued pursuant to predetermined fraudulent protocols.

173.    For example, many of the prescriptions identified in Exhibits "1" - "15" were not actually issued by the Referring Provider listed on the prescription. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions as these prescriptions contained a photocopied signature or utilized a signature stamp of the Referring Provider.

174.    Virtually all of the claims identified in Exhibits "1" through "15" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various No-Fault Clinics across the New York metropolitan area.

            a.    **The No-Fault Clinic located at 2354 Westchester Ave., Bronx, New York**

175.    The No-Fault Clinic located at 2354 Westchester Ave., Bronx, New York (the "Westchester Ave. Clinic") was one of the No-Fault Clinics where Defendants conspired with others not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent

Equipment pursuant to a predetermined fraudulent protocol and serves to demonstrate the scope of Defendants' fraudulent scheme as it shifted operations from one DME Entity to the next to avoid detection.

176.    After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds who purportedly received Fraudulent Equipment from ABV Supplies, Gorsk Supplies, Guseyn Supplies, Sarat Supplies, Sarvat Supplies, and Zastava Supplies and identified in Exhibits "1" – "6" who purportedly received treatment at the Westchester Ave. Clinic were provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

177.    The Referring Providers who purportedly conducted an initial evaluation on the Insureds at the Westchester Ave. Clinic did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

178.    Rather, the Referring Providers at the Westchester Ave. Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol established by the Clinic Controllers.

179.    Further, virtually every Insured who underwent an initial examination at the Westchester Ave. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

180.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibits "1" – "6" treating at the Westchester Ave. Clinic: (i) "Cervical pillow"; (ii) "Lumbar cushion";

(iii) "Lumbar sacral support (LSO)"; (iv) "Bed board"; (v) "Egg crate mattress"; (vi) "Cervical collar"; and (vii) "Thermal moist heat pad".

181.    To the extent that the Insureds identified in Exhibits "1" – "6" returned to the Westchester Ave. Clinic, they would virtually always be provided with additional prescriptions for an additional set of Fraudulent Equipment purportedly issued by the Referring Providers. These would include: (i) "Infra red lamp"; (ii) "Personal massager"; (iii) "EMS unit"; and (iv) "EMS belt" and would also often include a "Whirlpool".

182.    In addition, the Referring Providers would also routinely issue one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO w/APL Control Custom"; (ii) "K.O. (Custom fitted)"; (iii) "Cervical traction w/ pump"; and/or (iv) "Shoulder orthosis custom fit".

183.    These protocols included the issuance of multiple prescriptions for Fraudulent Equipment to an Insured on a single date when there was no legitimate reason to do so.

184.    As demonstrated above, the vast majority of these prescriptions contained a photocopied signature of the Referring Provider who purportedly issued the prescription.

185.    Further, prescriptions were purportedly issued to Insureds on dates where the Insureds never even treated with the Referring Provider who purportedly issued the prescription.

186.    The prescription protocol established at Westchester Ave. Clinic allowed the Defendants to mask the breadth of their fraudulent scheme, as the prescriptions were shifted between DME Entities and used by the Defendants as the basis to bill Liberty Mutual and other New York automobile insurers. The following examples illustrate the scheme:

        (i)    On May 11, 2021, an Insured named AH was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Westchester Ave. Clinic. After an initial examination with Jeremia Rachunow, M.D. ("Rachunow") on May 12, 2021, Rachunow purportedly issued a prescription in the name of AH for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | "L0627 Lumbar support (10" back panel)"<br>"E2611 Lumbar Back Cushion"<br>"L0172 Cervical collar, Semi-rigid Thermoplast"<br>"E0184 Egg Crate Mattress"<br>"E0190 Positioning Cushion/Pillow"<br>"E0199 Bed Board"<br>"E0215 Heating Pad (Thermophore)"<br>"E0217 Cold/Hot Water Circulation Unit"<br>"E2619 Orthopedic Car Seat"<br>"EA9273 Cold and Hot Pack Knee/Ankle"<br>"L1831 Knee Support"<br>"L3962 Shoulder Elbow Wrist" | ABV Supplies |

On June 15, 2021, Rachunow purportedly issued five separate prescriptions in the name of AH, despite not examining or otherwise treating AH on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt<br>Whirlpool | ABV Supplies |
| 2 | Shoulder orthosis custom fit - L | ABV Supplies |
| 3 | Shoulder orthosis custom fit - R | ABV Supplies |
| 4 | K.O. (Custom fitted) – R | ABV Supplies |
| 5 | K.O. (Custom fitted) – L | ABV Supplies |

Also on June 15, 2021, Leonid Simakovsky, D.C. ("Simakovsky"), purportedly issued two separate prescriptions in the name of AH, despite not examining or otherwise treating AH on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical traction w/ pump | ABV Supplies |
| 2 | LSO w/ APL control custom | ABV Supplies |

(ii) On April 22, 2023, an Insured named NM was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Westchester Ave. Clinic. After an initial examination with Jordan Fersel,

M.D. ("Fersel") on April 24, 2023, Fersel purportedly issued a prescription in the name of NM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical pillow<br>Lumbar cushion<br>Lumbar sacral support (LSO)<br>Bed board<br>Egg crate mattress<br>Cervical collar<br>Thermal moist heat pad | **Zastava Supplies** |

On May 25, 2023, after a purported follow-up examination with Neil Salka, D.C. ("Salka"), Salka purportedly issued two separate prescriptions in the name of NM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction w/ Pump | **Zastava Supplies** |
| 2 | LSO w/ APL Control Custom | **Zastava Supplies** |

On May 25, 2023 Fersel purportedly issued two separate prescriptions in the name of NM, despite not examining or otherwise treating NM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt | **Zastava Supplies** |
| 2 | Shoulder Orthosis Custom Fit | **Zastava Supplies** |

(iii)  On May 29, 2023, an Insured named AB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Westchester Ave. Clinic.  After an initial examination with Fersel on June 12, 2023, Fersel purportedly issued a prescription in the name of AB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical pillow<br>Lumbar cushion<br>Lumbar sacral support (LSO)<br>Bed board<br>Egg crate mattress | **Gorsk Supplies** |

| | |
|---|---|
| Cervical collar<br>Thermal moist heat pad | |

On July 17, 2023, after a purported follow-up examination with Fersel, Fersel purportedly issued three separate prescriptions in the name of AB for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt | **Gorsk Supplies** |
| 2 | K.O. (Custom fitted) - R | **Gorsk Supplies** |
| 3 | Shoulder orthosis custom fit - R | **Gorsk Supplies** |

Also on July 17, 2023, Salka purportedly issued two separate prescriptions in the name of AB for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical traction w/ pump | **Gorsk Supplies** |
| 2 | LSO w/ APL control custom | **Gorsk Supplies** |

(iv)    On December 27, 2023, an Insured named JN was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Westchester Ave. Clinic. After a purported follow up examination with Fersel on May 6, 2024, Fersel purportedly issued a prescription in the name of JN for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt<br>Whirlpool | **Sarat Supplies** |

Also on May 6, 2023, after a purported follow-up examination with Salka, Salka purportedly issued a prescription in the name of JN for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical traction w/ pump | **Sarat Supplies** |

(v)     On December 29, 2023, an Insured named JR was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Westchester Ave. Clinic. After an initial examination with Fersel on January 8, 2024, Fersel purportedly issued a prescription in the name of JR for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical pillow<br>Lumbar cushion<br>Lumbar sacral support (LSO)<br>Bed board<br>Egg crate mattress<br>Cervical collar<br>Thermal moist heat pad | Non-Defendant DME Supplier |

On February 5, 2024, after a follow-up examination with Fersel, Fersel purportedly issued a prescription in the name of JR for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt<br>Whirlpool | Non-Defendant DME Supplier |

On April 29, 2024, after a follow up examination with Fersel, Fersel purportedly issued two separate prescriptions in the name of JR for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt<br>Whirlpool | **Guseyn Supplies** |
| 2 | Shoulder Orthosis Custom Fit – L | **Guseyn Supplies** |

Also on April 29, 2024, Salka purportedly issued two separate prescriptions in the name of JR, despite not examining or otherwise treating JR on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical traction w/ pump | **Guseyn Supplies** |

| 2 | LSO w/ APL control custom | **Guseyn Supplies** |

(vi)    On May 9, 2024, an Insured named CH was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Westchester Ave. Clinic.  After an initial examination with Fersel on May 20, 2024, Fersel purportedly issued two prescriptions in the name of CH for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical pillow<br>Lumbar cushion<br>Lumbar sacral support (LSO)<br>Bed board<br>Egg crate mattress<br>Cervical collar<br>Thermal moist heat pad | **Sarvat Supplies** |
| 2 | Osteogenesis stimulator | **Sarvat Supplies** |

On June 12, 2024, Fersel purportedly issued a prescription in the name of CH, despite not examining or otherwise treating CH on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Infra red lamp<br>Personal massager<br>EMS unit<br>EMS belt<br>Whirlpool | **Sarvat Supplies** |

Also on June 12, 2024, Salka purportedly issued two separate prescriptions in the name of CH, despite not examining or otherwise treating CH on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical traction w/ pump | **Sarvat Supplies** |
| 2 | LSO w/ APL control custom | **Sarvat Supplies** |

187.    These are only representative examples.

188.    In fact, virtually all the Insureds identified in Exhibits "1" – "15" who treated at the Westchester Ave. Clinic were issued prescriptions for the same type of Fraudulent Equipment

pursuant to the predetermined fraudulent protocols identified above and without regard for the medically necessity of such items.

### b.   The No-Fault Clinic Located at 1100 Pelham Parkway South, Bronx, New York

189.   The No-Fault Clinic located at 1100 Pelham Parkway South., Bronx, New York (the "Pelham Pkwy. Clinic") was another of the No-Fault Clinics where Defendants conspired with others not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol and further serves to demonstrate the scope of Defendants' fraudulent scheme as it shifted operations from one DME Entity to the next to avoid detection.

190.   After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds who purportedly received Fraudulent Equipment from Atlantic Supply, Baltic Supply, Vittel Supplies, Xpert Supplies, and Zarev Supplies and identified in Exhibits "7" – "11" who purportedly received treatment at the Pelham Pkwy. Clinic were provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

191.   The Referring Providers who purportedly conducted an initial evaluation on the Insureds at the Pelham Pkwy. Clinic did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

192.   Rather, the Referring Providers at the Pelham Pkwy. Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol established by the Clinic Controllers.

193.    Further, virtually every Insured who underwent an initial examination at the Pelham Pkwy. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

194.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibits "7" – "11" treating at the Pelham Pkwy. Clinic: (i) "Cervical Phil. Collar, 2 Piece"; (ii) "Cervical Pillow"; (iii) "Lumbar Sacrum Orthosis"; (iv) "Lumbar Cushion"; (v) "Bed Board"; (vi) "Dry Pressure Mattress"; and (vii) "Water Circ. Cold Pad w/ Pump".

195.    To the extent that the Insureds identified in Exhibits "7" – "11" returned to the Pelham Pkwy. Clinic, they would virtually always be provided with additional prescriptions for an additional set of Fraudulent Equipment purportedly issued by the Referring Providers. These would include: (i) "EMS Unit"; (ii) "EMS Belt"; (iii) "Infra Red Heating Lamp"; and (iv) "Massage" and often also included a "Whirlpool".

196.    In addition, the Referring Providers would also routinely issue one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO Back Brace, Custom"; (ii) "Cervical Neck Pump"; (iii) "Knee Brace, Custom"; (iv) "Shoulder Support (Custom Fitted)"; and/or (v) "TLSO Trunk Support (Custom Fitted)".

197.    These protocols included the issuance of multiple prescriptions for Fraudulent Equipment to an Insured on a single date when there was no legitimate reason to do so.

198.    Further, prescriptions were purportedly issued to Insureds on dates where the Insureds never even treated with the Referring Provider who purportedly issued the prescription.

199.    The prescription protocol established at the Pelham Pkwy. Clinic allowed the Defendants to mask the breadth of their fraudulent scheme, as the prescriptions were shifted

between DME Entities and used by the Defendants as the basis to bill Liberty Mutual and other

New York automobile insurers.  The following examples illustrate the scheme:

     (i)     On June 12, 2021, an Insured named YPC was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Pelham Pkwy. Clinic.  After an initial examination with Hong Pak, M.D. ("Pak") on June 16, 2021, Pak purportedly issued a prescription in the name of YPC for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Phil. Collar, 2 Piece<br>Cervical Pillow<br>Lumbar Sacrum Orthosis<br>Lumbar Cushion<br>Bed Board<br>Dry Pressure Mattress<br>Water Circ. Cold Pad w/ Pump<br>Orthopedic Car Seat<br>Knee Orthosis – L<br>Shoulder Orthosis – L & R<br>Wrist Orthosis Custom Fitted – L & R | **Baltic Supply** |

On July 28, 2021, after a purported follow-up examination with Pak, Pak purportedly issued a prescription in the name of YPC for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>EMS Belt<br>Infra-Red Heating Lamp<br>Massage<br>Whirlpool<br>EMS Accessory Kit | **Baltic Supply** |

On August 25, 2021, Pak purportedly issued a prescription in the name of YPC, despite not treating or otherwise examining YPC on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical neck pump<br>Shoulder Support (Custom Fitted) – R<br>TLSO Trunk Support (Custom Fitted) | **Xpert Supply** |

On September 15, 2021, Pak purportedly issued a prescription in the name of YPC, despite not treating or otherwise examining YPC on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Knee Brace, Custom – L<br>Wrist - L | **Xpert Supply** |

(ii)    On June 20, 2021, an Insured named EN was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Pelham Pkwy. Clinic. After an initial examination with Pak on June 30, 2021, Pak purportedly issued a prescription in the name of EN for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Phil. Collar, 2 Piece<br>Cervical Pillow<br>Lumbar Sacrum Orthosis<br>Lumbar Cushion<br>Bed Board<br>Dry Pressure Mattress<br>Water Circ. Cold Pad w/ Pump<br>Orthopedic Car Seat<br>Shoulder Orthosis – R | **Baltic Supply** |

After a purported follow-up examination with Pak on August 18, 2021, Pak purportedly issued an undated prescription in the name of EN for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>EMS Belt<br>Infra-Red Heating Lamp<br>Massage<br>Whirlpool<br>EMS Accessory Kit | **Xpert Supply** |

On November 11, 2021, Pak purportedly issued a prescription in the name of EN, despite not examining or otherwise treating EN on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Support (Custom Fitted) – L<br>TLSO Trunk Support (Custom Fitted) | **Xpert Supply** |

(iii)    On November 10, 2021, an Insured named CG was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Pelham Pkwy. Clinic. After an initial examination with Pak on December 1, 2021, Pak purportedly issued a prescription in the name of CG for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Phil. Collar, 2 Piece<br>Cervical Pillow<br>Lumbar Sacrum Orthosis<br>Lumbar Cushion<br>Bed Board<br>Dry Pressure Mattress<br>Water Circ. Cold Pad w/ Pump<br>Orthopedic Car Seat<br>Shoulder Orthosis – R & L<br>Wrist Orthosis Custom Fitted - R | **Xpert Supply** |

On January 21, 2022, after a purported follow-up examination with Fersel, Fersel purportedly issued a prescription in the name of CG for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>EMS Belt<br>Infra-Red Heating Lamp<br>Massage | **Atlantic Supply** |

On February 1, 2022, after a purported examination with Joseph Detullio, D.C. ("Detullio"), Detullio purportedly issued a prescription in the name of CG for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Neck Pump | **Atlantic Supply** |

On March 11, 2022, Fersel purportedly issued a prescription in the name of CG, despite not examining or otherwise treating CG on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder Support (Custom Fitted) – L | **Atlantic Supply** |

(iv)    On May 7, 2022, an Insured named DJ was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Pelham

Pkwy. Clinic. After an initial examination with Pak on May 11, 2022, Pak purportedly issued two separate prescriptions in the name of DJ for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Phil. Collar, 2 Piece<br>Cervical Pillow<br>Lumbar Sacrum Orthosis<br>Lumbar Cushion<br>Bed Board<br>Dry Pressure Mattress<br>Water Circ. Cold Pad w/ Pump<br>Shoulder Orthosis – R & L | **Atlantic Supply** |
| 2 | Orthopedic car seat | **Atlantic Supply** |

On July 8, 2022, after a purported follow-up examination with Pak, Malks purportedly issued a prescription in the name of DJ for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>EMS Belt<br>Infra-Red Heating Lamp<br>Massage<br>Whirlpool<br>EMS Accessory Kit<br>Thermophore | Non-Defendant DME Supplier |

On July 13, 2022, Pak purportedly issued a prescription in the name of DJ, despite not examining or otherwise treating DJ on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO Back Brace, Custom<br>Cervical Neck Pump<br>TLSO Trunk Support (Custom Fitted) | **Atlantic Supply** |

(v)    On May 22, 2024, an Insured named EM was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Pelham Pkwy. Clinic. After an initial examination with Joyce Malks, P.A. ("Malks") on May 28, 2024, Malks purportedly issued a prescription in the name of EM for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Phil. Collar, 2 Piece | **Zarev Supply** |

| | |
|---|---|
| Cervical Pillow<br>Lumbar Sacrum Orthosis<br>Lumbar Cushion<br>Bed Board<br>Dry Pressure Mattress<br>Water Circ. Cold Pad w/ Pump | |

On July 2, 2024, after a purported follow-up examination with Malks, Malks purportedly issued a prescription in the name of EM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>EMS Belt<br>Infra-Red Heating Lamp<br>Massage<br>Whirlpool | **Zarev Supply** |

On July 16, 2024, Malks purportedly issued a prescription in the name of EM, despite not examining or otherwise treating EM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Knee Brace, Custom – R<br>Shoulder Support (Custom Fitted) – L & R | **Zarev Supply** |

On September 4, 2024, Stella Amanze, P.A. ("Amanze") purportedly issued a prescription in the name of EM, despite not examining or otherwise treating EM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Back Brace, Custom | **Vittel Supply** |

On October 23, 2024, Amanze purportedly issued a prescription in the name of EM, despite not examining or otherwise treating EM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Neck Pump | **Vittel Supply** |

(vi)    On July 26, 2024, an Insured named DF was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Pelham Pkwy. Clinic. After an initial examination with Malks on July 30, 2024, Malks purportedly issued a prescription in the name of DF for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Phil. Collar, 2 Piece<br>Cervical Pillow<br>Lumbar Sacrum Orthosis<br>Lumbar Cushion<br>Bed Board<br>Dry Pressure Mattress<br>Water Circ. Cold Pad w/ Pump<br>Walking Cane | **Vittel Supply** |

On August 28, 2024, after a purported follow-up examination with Amanze, Amanze purportedly issued a prescription in the name of DF for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>EMS Belt<br>Infra-Red Heating Lamp<br>Massage<br>Whirlpool<br>EMS Accessory Kit<br>Thermophore | **Vittel Supply** |

On September 18, 2024, Arlene Huey, P.A. ("Huey") purportedly issued a prescription in the name of DF, despite not examining or otherwise treating DF on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Back Brace, Custom<br>Cervical Neck Brace<br>Shoulder Support (Custom Fitted) - R | **Vittel Supply** |

200.   These are only representative examples.

201.   In fact, virtually all the Insureds identified in Exhibits "7" – "11" who treated at the Pelham Pkwy. Clinic were issued prescriptions for the same type of Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above and without regard for the medically necessity of such items.

      c.     **The No-Fault Clinic Located at 3041 Avenue U, Brooklyn, New York**

202.     The No-Fault Clinic located at 3041 Avenue U, Brooklyn, New York (the "Avenue U Clinic") was another of the No-Fault Clinics where Defendants conspired with others not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol and further serves to demonstrate the scope of Defendants' fraudulent scheme as it shifted operations from one DME Entity to the next to avoid detection.

203.     After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds who purported received Fraudulent Equipment from Argo Equipment, Omega Equipment, and Prompt Direct Supply and identified in Exhibits "12" – "14" who purportedly received treatment at the Avenue U Clinic were purportedly provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

204.     The Referring Providers who purportedly conducted an initial evaluation on the Insureds at the Avenue U Clinic did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

205.     Rather, the Referring Providers at the Avenue U Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol established by the Clinic Controllers.

206.     Further, virtually every Insured who underwent an initial examination at the Avenue U Clinic received a prescription for virtually the same type of Fraudulent Equipment.

207.     Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a

minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibits "12" – "14" treating at the Avenue U Clinic: (i) "Bed Board"; (ii) "Cervical Pillow"; (iii) "Lumbar Cushion"; (iv) "LSO"; (v) "Thermophore"; (vi) "Egg Crate Mattress"; and (vii) "Water Circulation Unit".

208.    To the extent that the Insureds identified in Exhibits "12" – "14" returned to the Avenue U Clinic, they would virtually always be provided with additional prescriptions for an additional set of Fraudulent Equipment purportedly issued by the Referring Providers. These would include: (i) "EMS (4 Leads)"; (ii) "Infrared Lamp"; (iii) "Massager"; and (iv) "Whirlpool".

209.    In addition, the Referring Providers would also routinely issue one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO APL Custom Fitted"; (ii) "Cervical Traction Unit w/Pump"; and/or (iii) "Knee Support Custom Fitted".

210.    Further, prescriptions were purportedly issued to Insureds on dates where the Insureds never even treated with the Referring Provider who purportedly issued the prescription.

211.    The prescription protocol established at the Avenue U Clinic allowed the Defendants to mask the breadth of their fraudulent scheme, as the prescriptions were shifted between DME Entities and used by the Defendants as the basis to bill Liberty Mutual and other New York automobile insurers. The following examples illustrate the scheme:

> (i)    On August 14, 2021, an Insured named CW was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Avenue U Clinic. After an initial examination with Natalia Feldman, N.P. ("Feldman") on August 16, 2021, Feldman purportedly issued a prescription in the name of CW for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>LSO<br>Thermophore | **Prompt Direct Supply** |

| | |
|---|---|
| Egg Crate Mattress<br>Water Circulation Unit w/Pump<br>Orthopedic Car Seat | |

On November 23, 2021, Feldman purportedly issued a prescription in the name of CW, despite not examining or otherwise treating CW on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO APL Custom Fitted | Non-Defendant DME Supplier |

(ii)    On August 14, 2021, an Insured named HO was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Avenue U Clinic. After an initial examination with Feldman on August 16, 2021, Feldman purportedly issued a prescription in the name of HO for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Water Circulation Unit w/Pump<br>Knee Support - L | **Prompt Direct Supply** |

On September 16, 2021, Feldman purportedly issued a prescription in the name of HO, despite not examining or otherwise treating HO on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction Unit w/Pump | **Argo Equipment** |

(iii)    On August 14, 2021, an Insured named MD was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Avenue U Clinic. After an initial examination with Feldman on August 23, 2021, Feldman purportedly issued a prescription in the name of MS for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Bed Board | **Argo Equipment** |

| | | |
|---|---|---|
| | Cervical Pillow<br>Lumbar Cushion<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Water Circulation Unit w/Pump | |

On July 13, 2022, Feldman purportedly issued a prescription in the name of MD, despite not examining or otherwise treating MD on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction Unit w/Pump | **Argo Equipment** |

On September 8, 2022, Feldman purportedly issued a prescription in the name of MD, despite not examining or otherwise treating MD on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee Support Custom Fitted - R | **Argo Equipment** |

(iv) On November 9, 2022, an Insured named BO was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Avenue U Clinic. After an initial examination with Michael Alleyne, M.D. ("Alleyne") on November 28, 2022, Alleyne purportedly issued a prescription in the name of BO for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Water Circulation Unit<br>Orthopedic Car Seat | **Omega Equipment** |

On December 7, 2022, Osewa Olatokunbo, F.N.P. ("Olatokunbo") purportedly issued a prescription in the name of BO, despite not examining or otherwise treating BO on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| | | |

| 1 | Cervical Traction Unit W/Pump | **Omega Equipment** |

On January 3, 2023, Olatokunbo purportedly issued a prescription in the name of BO, despite not examining or otherwise treating BO on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO APL Custom Fitted | **Omega Equipment** |

On January 9, 2023, after a purported follow-up examination with Olatokunbo, Olatokunbo purportedly issued a prescription in the name of BO for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS (4 Leads) Massager Infrared Lamp Whirlpool | Non-Defendant DME Supplier |

(v)    On October 26, 2022, an Insured named AB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Avenue U Clinic. After a purported initial examination with Alleyne on November 3, 2022, Alleyne purportedly issued a prescription in the name of AB for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Bed Board Cervical Pillow Lumbar Cushion LSO Thermophore Egg Crate Mattress Water Circulation Unit | **Omega Equipment** |

On November 10, 2022, Alleyne purportedly issued a prescription in the name of AB, despite not examining or otherwise treating AB on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder Brace - R | **Omega Equipment** |

On November 18, 2022, Alleyne purportedly issued a prescription in the name of AB, despite not examining or otherwise treating AB on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction Unit w/ Pump | **Omega Equipment** |

On December 8, 2022, after a purported follow-up examination with Olatokunbo, Olatokunbo purportedly issued a prescription in the name of AB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS (4 Leads) Massager Infrared Lamp Whirlpool | **Omega Equipment** |

212.   These are only representative examples.

213.   In fact, virtually all the Insureds identified in Exhibits "1" – "15" who treated at the Avenue U Clinic were issued prescriptions for the same type of Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above and without regard for the medically necessity of such items.

### d.   The Predetermined Prescription Protocol Involving Affordable Supply

214.   Unlike the other DME Entities, which billed Liberty Mutual for different types of Fraudulent Equipment, Affordable Supply primarily received prescriptions and billed Liberty Mutual for the Fraudulent Equipment prescribed after purported "follow-up" examinations with Referring Providers.

215.   Affordable Supply received prescriptions for Fraudulent Equipment from at least thirteen (13) separate No-Fault Clinics.

216.   Similar to the predetermined treatment protocols identified at the No-Fault Clinics above, Referring Providers would purportedly issue prescriptions that were routed to Affordable

Supply in the claims identified in Exhibit "15" based upon the protocols established at their respective No-Fault Clinic.

217.    However, regardless of the No-Fault Clinic, and based upon the predetermined prescription protocols established with the Defendants, the Referring Providers purportedly would each prescribe after a follow-up examination Fraudulent Equipment that virtually always included: (i) EMS Unit; (ii) EMS Belt; (iii) Massager; (iv) Infrared Heat Lamp; and/or; (v) Whirlpool.

218.    Referring Providers at the No-Fault Clinics prescribed this predetermined Fraudulent Equipment as a matter of course, despite the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment.  For example:

(i)     On November 17, 2021, an Insured named SO was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the No-Fault Clinic located at 3626 Bailey Ave., Bronx, New York.  After a follow-up examination with Carlotta Ross-Distin, P.A. ("Ross-Distin") on April 7, 2022, Ross-Distin purportedly issued a prescription in the name of SO for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | "EMS Unit"<br>"Infra-red Heating Lamp"<br>"Massage"<br>"Whirlpool" | **Affordable Supply** |

(ii)    On March 2, 2022, an Insured named NA was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York.  After a follow-up examination with Youn Ju Lee, F.N.P. ("Lee") on April 6, 2022, Lee purportedly issued a prescription in the name of NA for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | "EMS Unit"<br>"EMS Belt"<br>"Infrared Heating Lamp"<br>"Whirlpool" | **Affordable Supply** |

(iii)   On January 9, 2022, an Insured named HW was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the No-Fault Clinic located at 4104 Farragut Rd., Brooklyn, New York. After a follow-up examination with Pauline Raitses, D.O. ("Raitses") on April 5, 2022, Raitses purportedly issued a prescription in the name of HW for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | "EMS Unit" "Infrared Heating Lamp" "Massager" "Whirlpool" | **Affordable Supply** |

(iv)   On February 6, 2022, an Insured named CF was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the No-Fault Clinic located at 552 E 180th St., Bronx, New York. After a follow-up examination with Andrew Glyptis, M.D. ("Glyptis") on April 5, 2022, Glyptis purportedly issued a prescription in the name of CF for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | "EMS Unit + kit" "EMS Placement Belt" "Infrared Heat Lamp" "Electric Massager" "Hydrotherapy Whirlpool" | **Affordable Supply** |

(v)   On January 10, 2022, an Insured named RB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the No-Fault Clinic located at 108-25 Merrick Blvd., Jamaica, New York. After a purported follow-up examination with Roland Rose, D.C. ("Rose") on February 3, 2022, Rose purportedly issued a prescription in the name of RB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | "EMS Unit" "Infrared Heating Lamp" "Massager" "Whirlpool" | **Affordable Supply** |

219.   These are only representative examples.

220.    In fact, virtually all the Insureds identified in Exhibit "15" were issued prescriptions for the same type of Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above and without regard for the medically necessity of such items.

### D.    The Defendants' Manipulation of the Prescriptions

221.    As a threshold matter, for a prescription to be valid it must first actually be issued by a healthcare provider who has determined that such a prescription is medically necessary.

222.    However, many of the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers from the Clinics were not valid prescriptions, as they routinely: (i) contained a photocopied signature of the Referring Provider; (ii) contained a signature stamp of the Referring Provider; (iii) were not referenced or explained in any contemporaneous medical record; and/or (iv) were issued on dates the Referring Provider never examined or otherwise treated the Insured.

223.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

224.    However, the DME Entities are not licensed medical professional corporations, and the Paper Owner Defendants and Management Defendants are not licensed to prescribe DME or OD to Insureds. As such, the Defendants were not lawfully permitted to prescribe or otherwise determine what DME or OD is medically necessary for the Insureds. For the same reason, the Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

225.    As part of the fraudulent scheme, in many of the fraudulent claims identified in Exhibits "1" – "15", the Defendants improperly decided what DME and OD to provide to Insureds

without a valid definitive prescription from a licensed healthcare provider, to the extent that they actually provided any DME or OD to the Insureds.

226.    More specifically, the prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers and provided to the Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

227.    To the extent that some of the fraudulent claims identified in Exhibits "1" - "15" were based upon prescriptions that contained HCPCS Codes next to the descriptions of DME and/or OD, the prescriptions were still vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code, or the Defendants simply ignored the HCPCS Code listed on the prescription and provided an item with a different HCPCS Code.

228.    While the prescriptions purportedly issued by the Referring Providers did not identify a specific type of medically necessary DME and/or OD for the Insureds, the Defendants did not obtain any additional documentation from the Referring Providers approving or otherwise acknowledging that specific types of DME and/or OD – either by HCPCS Code or a detailed description – was medically necessary for the Insureds.

229.    These vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Fee Schedule.

230.    In addition, in many of the fraudulent claims identified in Exhibits "1" – "15", the Defendants improperly decided what DME and OD to provide to Insureds without a valid

definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

231.    In a legitimate clinical setting, when a DME/OD supplier would obtain a prescription that did not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD Supplier would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

232.    As also part of a legitimate clinical setting, the DME/OD Supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

233.    Upon information and belief, the Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Defendants each elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid or WC Fee Schedule.

234.    For example, and as part of the Defendants' common scheme and operation under the control of the Management Defendants, the DME Entities improperly decided what DME/OD to provide Insureds – to the extent any items were actually provided – without a valid definitive prescription from a licensed healthcare provider involved, as shown above, for every prescription containing a vague description of a "Lumbar Sacral Support", "LSO", and/or "Lumbar Sacrum Orthosis".

235.    The prescriptions from the Referring Providers containing descriptions "Lumbar Sacral Support", "LSO", and/or "Lumbar Sacrum Orthosis" without an identifying HCPCS Code, correspond to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds.

236.    As unlicensed healthcare providers in regard to the prescribing of DME and/or OD items to patients, the Defendants were not legally permitted to determine which of the above-available options were medically necessary for each Insured based upon a vague prescription for "Lumbar Sacral Support", "LSO", and/or "Lumbar Sacrum Orthosis".

237.    However, the Defendants never contacted the Referring Provider, and instead decided themselves which specific type of Fraudulent Equipment they would bill Liberty Mutual for, and accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

238.    In response to such prescriptions, each of the DME Entities virtually always submitted a charge of either $759.92 using HCPCS Code L0634 or $741.59 using HCPCS Code L0650 pursuant to these generic prescriptions, which are among the highest maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

239.    Additionally, virtually every time that each of the DME Entities received a prescription from the Referring Providers for a "LSO w/ APL Control", Defendants billed Liberty Mutual using HCPCS Code L0632 requesting a reimbursement of $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to Liberty Mutual.

240.    Similarly, and as part of the common scheme and control by the Management Defendants, in response to prescriptions from the Referring Providers for a "Shoulder Orthosis", Defendants virtually always chose to supply and bill Liberty Mutual using HCPCS Code L3670

requesting a reimbursement of $111.07 or $251.34, despite the Fee Schedule containing eight different types of shoulder orthoses.

241.    Further, and as part of Defendants' common scheme and the control of the Management Defendants, in response to prescriptions from the Referring Providers for a "Knee Orthosis", Defendants virtually always chose to supply and bill Liberty Mutual using HCPCS Code L1831 requesting a reimbursement of $208.13, despite the Fee Schedule containing 20 different types of knee orthoses.

242.    As an additional example, Omega Equipment, Zastava Supplies, Sarvat Supplies, Gorsk Supplies, and Sarat Supplies received prescriptions for an "EMS Unit" but decided to instead provide Insureds and bill Liberty Mutual for TENS Units under HCPCS Code E0730.

243.    An EMS Unit performs an extremely different function from a TENS Unit, as an EMS Unit (**E**lectronic **M**uscle **S**timulation) is used to provide muscle stimulation to decrease muscle spasms or promote muscle growth, while a TENS Unit (**T**ranscutaneous **E**lectrical **N**erve **S**timulation) provides stimulation to the nerves to assist with pain management.

244.    These are only representative examples. To the extent that the Defendants actually provided any Fraudulent Equipment, they improperly prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibits "1" – "15" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide the Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

### E.    The Defendants' Common Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed

245.    In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants and

dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME/OD was medically necessary, the Defendants each submitted bills to Liberty Mutual that misrepresented the DME/OD provided to the Insureds – to the extent that any DME/OD actually was provided.

246.    As part of the Defendants' common scheme, the bills submitted to Liberty Mutual and other New York automobile insurers by the Defendants were also fraudulent in that they each made virtually identical misrepresentations in the DME and OD purportedly provided to the Insureds.

247.    In the bills and other documents submitted to Liberty Mutual, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

248.    In the bills and other documents submitted to Liberty Mutual, the Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between the Defendants and others who are presently unidentifiable.

249.    Further, the Defendants misrepresented in the bills submitted to Liberty Mutual that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

250.    Moreover, and as explained below, the bills submitted to Liberty Mutual by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that

the Fee Schedule items matched the HCPCS Codes identified in the bills to Liberty Mutual, when they did not.

251.    Further, the bills submitted to Liberty Mutual by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Non-Fee Schedule items were less than or equal to the maximum reimbursement rate allowable under the Fee Schedule, when in fact they were not.

252.    Thereafter, Defendants would submit multiple bills to Liberty Mutual for Fraudulent Equipment that was provided to Insureds on the same date in an attempt to conceal their scheme to fraudulently bill Liberty Mutual for Fraudulent Equipment purportedly provided to Liberty Mutual's Insureds by artificially lowering the amount of any one bill submitted to Liberty Mutual.

### 1.    The Defendants Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

253.    When the Defendants submitted bills to Liberty Mutual seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

254.    As part of the Defendants' common scheme and their operation at the direction and control of the Management Defendants, each of the DME Entities made virtually identical misrepresentations in the HCPCS Codes used to bill Liberty Mutual.

255.    By submitting bills to Liberty Mutual containing specific HCPCS Codes, the Defendants each represented that the Fraudulent Equipment purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

256.    In virtually all of the bills submitted to Liberty Mutual for Fee Schedule items, the Defendants fraudulently represented to Liberty Mutual that the HCPCS Codes were accurate and

appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

257.    The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Defendants each submitted bills to Liberty Mutual containing virtually identical HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

258.    As indicated above, as part of the collusive financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill Liberty Mutual for Fraudulent Equipment purportedly provided to the Insureds.

259.    However, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to Liberty Mutual severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

260.    As identified in the claims contained within Exhibits "1" – "15" where the Defendants submitted bills to Liberty Mutual for Fraudulent Equipment that was purportedly "custom fitted" or "custom fabricated" for each Insured, to the extent that the Fraudulent Equipment was actually provided to the Insureds, the Defendants never customized the Fraudulent Equipment as billed.

261.    For example, the Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill Liberty Mutual for purportedly providing custom-fit orthoses using HCPCS Code L1832 or custom fabricated orthoses using HCPCS Codes L0632, L0634, and L3674. Each of these items require that the

orthotic be custom fitted or custom fabricated for the patient, the customization must be performed by a certified orthotist, and the customization must be documented in contemporaneous notes.

262.    However, despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Codes L1832, L0632, L0634, and L3674, the specific orthotics provided by these Defendants – to the extent that the Defendants provided the Insureds with any OD – did not contain the requirements set forth in HCPCS Codes L1832, L0632, L0634, and L3674 because – at a minimum – the items were never customized for each patient.

263.    In keeping with the fact that the claims identified in Exhibits "1" – "15" for custom-fitted OD, including the claims for HCPCS Codes L1832, L0632, L0634, and L3674 fraudulently misrepresented that the Defendants satisfied all the requirements for the billed HCPCS Codes, the Defendants did not, and could not have, custom-fit or custom-fabricated he OD as required.

264.    To the extent that any of the charges identified in Exhibits "1" – "15" for custom-fitted OD, including the claims for HCPCS Codes L1832, L0632, L0634, and L3674 were provided, none of the Defendants ever customized the equipment as required by Palmetto.

265.    In order to help clarify the term "custom-fabricated", Palmetto defined a custom-fabricated orthotic as something that "is individually made for a specific patient. No other patient would be able to use this item. A custom fabricated item is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient". See Palmetto, Correct Coding –3-D Printed Orthotic Devices.

266.    In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

267.    To help clarify the term "custom fitted," Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

268.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

269.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American

Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

270.    In the claims identified in Exhibits "1" – "15" for custom-fitted OD, including the claims for HCPCS Codes L1832, L0632, L0634, and L3674, the Defendants fraudulently misrepresented that they provided the Insureds with OD that was custom-fitted or custom-fabricated as defined by Palmetto, by a certified orthotist.

271.    Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to Liberty Mutual as custom-fit or custom-fabricated OD, including the charges for HCPCS Codes L1832, L0632, L0634, and L3674, the Fraudulent Equipment was provided without taking any action to customize the OD to the Insureds. To the extent that the Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" -"15", the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

272.    In keeping with the fact that the Defendants misrepresented that they custom-fitted OD purportedly provided to Insureds and billed to Liberty Mutual, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

273.    In addition to the fraudulent charges for custom-fit or custom-fabricated OD submitted by the Defendants, the claims identified in Exhibits "1" – "15" for HCPCS Code E2611 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

274.    Each of the claims identified within Exhibits "1" – "15" for HCPCS Code E2611 contained a charge for $282.40 or $285.22 based upon prescriptions for a "Lumbar cushion" or "Cervical pillow".

275.    However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

276.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E2611, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion or cervical pillow – were not cushions for use with a wheelchair.

277.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" – "15" who were provided with a cushion by Defendants that was billed to Liberty Mutual under HCPCS Code E2611, were in a wheelchair.

278.    By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

279.    Unlike the fraudulent charges for $282.40 or $285.22 for each "lumbar cushion" or "cervical pillow" billed under HCPCS Code E2611 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

280.    The claims identified in Exhibits "1" - "15" for HCPCS Code E0184 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

281.    Each of the claims identified within Exhibits "1" - "15" for HCPCS Code E0184 contained a charge for $153.13 based upon prescriptions for an "Egg Crate Mattress".

282.    However, the product represented by HCPCS Code E0184 is defined as a dry pressure mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

283.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E0184, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item – were not dry pressure mattresses as required by HCPCS Code E0184.

284.    By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

285.    Unlike the fraudulent charges for $153.13 for each eggcrate mattress billed under HCPCS Code E0184 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

286.    In each of the claims identified within Exhibits "1" - "15" where Defendants billed for Fraudulent Equipment under HCPCS Code E0184, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0184.

287.    The claims identified in Exhibits "1" - "15" for HCPCS Code E0274 is another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

288.    Each of the claims identified within Exhibits "1" - "15" for HCPCS Code E0274 contained a charge for $101.85 based upon prescriptions for a "bed board".

289.    However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

290.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E0274, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not over-bed tables as required by HCPCS Code E0274.

291.    By contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are placed under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

292.    As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E0273 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

293.    Liberty Mutual was able to determine that bed boards are available for purchase to the general public on websites like Amazon.com for $42.99.

294.    Unlike the fraudulent charges for $101.85 for each bed board billed under HCPCS Code E0274 – and in keeping with the fact that the fraudulent charges were part of the Defendants' common scheme to defraud Liberty Mutual and other automobile insurers – as a Non-Fee Schedule Item the Defendants could charge no more than $42.99 under HCPCS Code E0273.

295.    In each of the claims identified within Exhibits "1" - "15" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

296.    The claims identified in Exhibits "1" - "15" for HCPCS Code T5001 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

297.    Each of the claims identified within Exhibits "1" – "15" for HCPCS Code T5001 contained a charge between $195.00 to $763.59 based upon prescriptions for an "Orthopedic car seat".

298.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons (primarily children) with special orthopedic needs such as cerebral palsy, whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat.

299.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code T5001, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not positioning seats for persons with special orthopedic needs, as required by HCPCS Code T5001.

300.    By contrast, to the extent that any items were provided, they were seat pads or cushions, which are Fee Schedule items listed using HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories.

301.    Unlike the fraudulent charges for between $195.00 to $763.59 for each "orthopedic car seat" billed using HCPCS Code T5001 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed using HCPCS Code E0190.

302.    In each of the claims identified within Exhibits "1" – "15" where the Defendants billed for Fraudulent Equipment using HCPCS Code T5001, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code T5001.

303.    These are only representative examples. The vast majority of claims for Fee Schedule items identified within Exhibits "1" - "15", to the extent that any Fraudulent Equipment was actually provided, Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to Liberty Mutual in order to increase the amount of No-Fault Benefits they could obtain, and were therefore not entitled to collect No-Fault Benefits in the first instance.

## 2.    The Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

304.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

305.    By submitting bills to Liberty Mutual for Non-Fee Schedule items, Defendants each represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

306.    However, and as part of their common scheme and control by the Management Defendants, in virtually all of the charges to Liberty Mutual identified in Exhibits "1" - "15" for Non-Fee Schedule items, Defendants fraudulently represented to Liberty Mutual that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

307.    Instead, Defendants submitted bills to Liberty Mutual containing virtually identical charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from Liberty Mutual and other automobile insurers.

308.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

309.    When Defendants submitted bills to Liberty Mutual seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of Defendants' acquisition cost of purportedly high-quality items. In actuality, Defendants' legitimate acquisition cost for the low-quality items were significantly less.

310.    In keeping with the fact that Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to Liberty Mutual for the Non-Fee Schedule items solely for their financial benefit, Defendants purposefully attempted to conceal their effort to overcharge Liberty Mutual for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

311.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to Liberty Mutual

because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

312.    As part of their common scheme, the charges submitted to Liberty Mutual for Non-Fee Schedule items identified in Exhibits "1" - "15" virtually always misrepresented the permissible reimbursement amount.

313.    For example, Defendants each billed Liberty Mutual for infrared heat lamps under HCPCS Code E0205 with each DME Entity except for Affordable Supply and Guseyn Supplies charging $210.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

314.    Similarly, Affordable Supply billed Liberty Mutual $210.12 and Guseyn Supplies billed $335.00 per infrared heat lamp under HCPCS Code E0205.

315.    Unlike the fraudulent charges for between $210.00 and $335.00 submitted by Defendants under HCPCS Code E0205 for infrared heat lamps, the maximum reimbursement rate Defendants were entitled to receive were significantly less.

316.    The Defendants also each billed Liberty Mutual for personal massagers under HCPCS Code E1399 with a charge of $295.00 or $318.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

317.    Unlike the fraudulent charges for either $295.00 or $318.00 submitted by Defendants under HCPCS Code E1399 for personal massagers, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

318.    The Defendants also each billed Liberty Mutual for EMS units under HCPCS Code E1399 with a charge of $276.25 or $288.25 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

319.    Unlike the fraudulent charges for either $276.25 or $288.25 submitted by Defendants under HCPCS Code E1399 for EMS units, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

320.    The Defendants also each billed Liberty Mutual for Whirlpools under HCPCS Code E1310 with a charge of $424.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

321.    Unlike the fraudulent charges for $424.00 submitted by Defendants under HCPCS Code E1310 for Whirlpools, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

322.    These are only representative examples. In each of the claims identified within Exhibits "1" - "15" for Non-Fee Schedule items, each of Defendants fraudulently misrepresented in the bills submitted to Liberty Mutual that the charges were the lesser of 150% of the acquisition cost or the cost to the general public. The Defendants' misrepresentations regarding Non-Fee Schedule items inflated the charges submitted to Liberty Mutual and resulted in Defendants obtaining payment from Liberty Mutual under the New York "No-Fault" laws to which Defendants were never entitled.

**F.    Defendants' Failure to Comply with Local Licensing Provisions**

323.    As stated above, for a DME/OD supplier to provide DME or OD to patients within the City of New York, the DME/OD supplier must obtain a Dealer in Products License by the DCWP.

324.    For the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" through "15", the DME Entities were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "15" were located within the City of New York.

325.    As part of the Defendants scheme to defraud Liberty Mutual and other Insurers, the Defendants sought Dealer in Products Licenses from the DCWP in an effort to have the DME Entities appear to be legitimate.

326.    However, each of the DME Entities were not entitled to collect No-Fault Benefits from Liberty Mutual, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME or OD to Insureds.

327.    Each of the DME Entities, to the extent they obtained Dealer in Products licenses, were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses through fraud and/or misrepresentations.

328.    As part of obtaining a Dealer in Products License, each of the DME Entities completed a license application form that required it to identify – among other things – the commercial address of where each DME Entity physically operated from.

329.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

330.    However, and in support of the fact that the Defendants participated in a common scheme to defraud Liberty Mutual and other automobile insurers of No-Fault Benefits, the Paper Owner Defendants each knowingly provided false information in their Dealer in Products License applications filed on behalf of the DME Entities.

331.    To the extent that the DME Entities obtained a Dealer in Products License, the Paper Owner Defendants each falsely affirmed the business premises address of the respective DME Entities.

332.    The DME Entities used either residential apartments or the locations of other businesses from which the DME Entities did not operate in order to give themselves the appearance of legitimacy.

333.     For example, Gorsk Supplies, Guseyn Supplies, Sarat Supplies, Sarvat Supplies, Vittel Supplies, and Zarev Supplies each listed as their commercial address the Coney Island Ave. Address associated with Farberov on their applications.

334.     Further, ABV Supplies, Argo Equipment, and Zastava Supplies, listed residential apartments in Brooklyn, New York.

335.     Additionally, Baltic Supply, Prompt Direct Supply, and Xpert Supply listed the addresses of other businesses located in Brooklyn, New York.

336.     In further support of the fact that the DME Entities were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses under false pretenses, to the extent the DME Entities secured Dealer in Products licenses, each of the Paper Owner Defendants affirmed on their license applications, under penalty for false statements, that they were the sole owner of each respective DME Entity.

337.     In reality, as set forth above, the DME Entities were actually controlled by the Management Defendants who directly profited from the fraudulent scheme committed through the DME Entities.

338.     The Paper Owner Defendants knowingly provided false information regarding their business addresses and ownership to induce the DCWP to issue licenses to them, which would give the Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to Liberty Mutual and other Insurers through the DME Entities.

339.     Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

340.     In each of the claims identified in Exhibits "1" through "15" the Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory

requirements and were lawfully permitted to provide DME/OD to Insureds when the Defendants were never entitled to collect No-Fault Benefits in the first instance because the DME Entities did not lawfully obtain Dealer in Products Licenses as they received their Dealer in Products licenses under the false pretenses described above.

## III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to Liberty Mutual

341.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to Liberty Mutual through and in the name of the DME Entities, seeking payment for Fraudulent Equipment.

342.    The NF-3 forms, HCFA-1500 forms and treatment reports that the Defendants submitted or caused to be submitted to Liberty Mutual were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of the Fraudulent Equipment, it was based upon: it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols.

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment based on prescriptions secured through collusive arrangements with the John Doe

Defendants, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

(iii)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iv)     The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms.

(v)     The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of the Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their applications for a Dealer for Products License.

## IV.     The Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance

343.     The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

344.     To induce Liberty Mutual to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

345.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the provision of the Fraudulent Equipment was pursuant to a common insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

346.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and secured through collusive arrangements, including prescriptions that contained photocopied or otherwise duplicated signatures.

347.    Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent Liberty Mutual from discovering that the provision of the Fraudulent Equipment dispensed was pursuant to an insurance fraud scheme in which decisions were made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

348.    Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent Liberty Mutual from discovering that Fraudulent Equipment were billed to Liberty Mutual for financial gain

349.    Even more, the Defendants knowingly misrepresented and concealed facts to prevent Liberty Mutual from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to Liberty Mutual did not accurately reflect the type of Fraudulent Equipment purportedly provided to the Insureds.

350.    The Defendants also knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by Defendants to Liberty Mutual and did not include any invoices to support the charges in order to prevent Liberty Mutual from discovering that Non-Fee Schedule items were billed to Liberty Mutual for financial gain.

351.    Finally, the Defendants knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Entities to obtain a Dealer in Products License from the DCWP because the Paper Owner Defendants falsely indicated, under penalty for false statements, in the application for a Dealer in Products License the business addresses and common ownership by the Management Defendants of each of the DME Entities, and concealed these misrepresentations in order to submit bills to Liberty Mutual and prevent Liberty Mutual from discovering that Fraudulent Equipment were billed to Liberty Mutual for financial gain.

352.    The Defendants operated their fraudulent scheme in overlapping fashion designed to frustrate Liberty Mutual's efforts to identify fraud, shifting the billing from one DME Entity to the next over the course of the scheme. The billing and supporting documentation submitted by Defendants, when viewed in isolation, did not reveal its fraudulent nature.

353.    The Defendants hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers.  These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against Liberty Mutual and other insurers. The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, in which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault

arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different No-Fault Clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

354.    In fact, Defendants continue to have legal counsel pursue collection against Liberty Mutual and other insurers without regard for the fact that the DME Entities have been engaged in widespread fraud.

355.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $700,000.00 based upon the fraudulent charges representing payments made by Liberty Mutual to the Defendants.

356.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
**Against ABV Supplies, Affordable Supply, Argo Equipment, Atlantic Supply, Baltic Supply, Gorsk Supplies, Guseyn Supplies, Omega Equipment, Prompt Direct Supply, Sarat Supplies, Sarvat Supplies, Vittel Supplies, Xpert Supply, Zarev Supplies, and Zastava Supplies**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

357.    Liberty Mutual repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

358.    There is an actual case in controversy between Liberty Mutual and each of the DME Entities regarding more than $900,000.00 in fraudulent billing that has been submitted to Liberty Mutual in the names of the DME Entities. More specifically, the amount of fraudulent billing between Liberty Mutual and each of the DME Entities that remains in dispute is as follows:

| Provider | Unpaid Billing |
|---|---|
| ABV Supplies | $54,000.00 |
| Affordable Supply | $22,000.00 |
| Argo Equipment | $192,000.00 |
| Atlantic Supply | $69,000.00 |
| Baltic Supply | $67,000.00 |
| Gorsk Supplies | $91,000.00 |
| Guseyn Supplies | $145,000.00 |
| Omega Equipment | $64,000.00 |
| Prompt Direct Supply | $78,000.00 |
| Sarat Supplies | $8,000.00 |
| Sarvat Supplies | $54,000.00 |
| Vittel Supplies | $18,000.00 |
| Xpert Supply | $96,000.00 |
| Zarev Supplies | $28,000.00 |
| Zastava Supplies | $23,000.00 |

359.    The DME Entities have no right receive payment for any pending bills submitted to Liberty Mutual because the bills for Fraudulent Equipment were not based upon medical necessity but were instead submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

360.    The DME Entities have no right to receive payment for any pending bills submitted to Liberty Mutual because the bills for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and prescriptions secured through

collusive arrangements, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

361.    The DME Entities have no right to receive payment for any pending bills submitted to Liberty Mutual because the DME Entities purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

362.    The DME Entities have no right to receive payment for any pending bills submitted to Liberty Mutual because – to the extent the DME Entities actually provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

363.    The DME Entities have no right to receive payment for any pending bills submitted to Liberty Mutual because – to the extent the DME Entities provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to Liberty Mutual were less than or equal to the maximum permissible reimbursement amount.

364.    The DME Entities have no right to receive payment for any pending bills submitted to Liberty Mutual because they failed to comply with local licensing requirements falsified their business address and concealed the ownership interests of the Management Defendants in their applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

365.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the DME Entities.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

366.    Liberty Mutual repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

367.    ABV Supplies, Affordable Supply, Argo Equipment, Atlantic Supply, Baltic Supply, Gorsk Supplies, Guseyn Supplies, Omega Equipment, Prompt Direct Supply, Sarat Supplies, Sarvat Supplies, Vittel Supplies, Xpert Supply, Zarev Supplies, and Zastava Supplies together constitute an association-in-fact "enterprise" (the "Farberov Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

368.    The members of the Farberov Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, ABV Supplies, Affordable Supply, Argo Equipment, Atlantic Supply, Baltic Supply, Gorsk Supplies, Guseyn Supplies, Omega Equipment, Prompt Direct Supply, Sarat Supplies, Sarvat Supplies, Vittel Supplies, Xpert Supply, Zarev Supplies, and Zastava Supplies are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Liberty Mutual.

369.    The Farberov Enterprise operated using 15 separate names and tax identification numbers in order to limit the time period, volume of bills, and types of Fraudulent Equipment submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Liberty Mutual and other New York automobile insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this

scheme would be beyond the capacity of each member of the Farberov Enterprise acting singly or without the aid of each other.

370.    The Farberov Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Liberty Mutual and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

371.    The Paper Owner Defendants and Management Defendants have each been employed by and/or associated with the Farberov Enterprise.

372.    The Paper Owner Defendants and Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Farberov Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges for more than two years – and to continue efforts to collect on these charges through the present - seeking payments that the Farberov Enterprise was not entitled to receive under the No-Fault Laws, because: (i) the bills submitted to Liberty Mutual for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not

presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; (v) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the DME Entities failed to comply with local licensing requirements as they knowingly falsified information on their applications for a Dealer in Products License. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" – "15".

373. The Farberov Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and Management Defendants operated the DME Entities, inasmuch as the DME Entities never operated as a legitimate DME/OD providers, never were entitled to bill for or collect No-Fault Benefits and the

acts of mail fraud therefore were essential in order for the DME Entities to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the DME Entities to the present day.

374.    The Farberov Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual and other New York automobile insurers. These inherently unlawful acts are taken by the Farberov Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-fault billing. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Farberov Enterprise.

375.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

376.    Liberty Mutual repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

377.    The Farberov Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

378.    The Paper Owner Defendants and Management Defendants are employed by and/or associated with the Farberov Enterprise.

379.    The Paper Owner Defendants and Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct

of the Farberov Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges for more than two years - and to continue efforts to collect on those charges through the present – seeking payments that the DME Entities were not entitled to receive under the No-Fault Laws because: (i) the bills submitted to Liberty Mutual for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; (v) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the DME Entities failed to comply with local licensing requirements as they knowingly falsified information on their applications for a Dealer in Products

License. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" – "15".

380.    The Paper Owner Defendants and Management Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Liberty Mutual.

381.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted by Defendants through the Farberov Enterprise.

382.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against ABV Supplies, Beliakouskaya, and the Management Defendants**
**(Common Law Fraud)**

383.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

384.    ABV Supplies, Beliakouskaya, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

385.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an

insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that ABV Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact ABV Supplies was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty

Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

386.   ABV Supplies, Beliakouskaya, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through ABV Supplies that were not compensable under New York no-fault insurance laws.

387.   Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $100,000.00 pursuant to the fraudulent bills submitted by ABV Supplies, Beliakouskaya, and the Management Defendants.

388.   ABV Supplies, Beliakouskaya, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

389.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against ABV Supplies, Beliakouskaya, and the Management Defendants
### (Unjust Enrichment)

390.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

391.    As set forth above, ABV Supplies, Beliakouskaya, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

392.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Hatzalah OS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

393.    ABV Supplies, Beliakouskaya, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that ABV Supplies, Beliakouskaya, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

394.    ABV Supplies, Beliakouskaya, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

395.    By reason of the above, ABV Supplies, Beliakouskaya, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $100,000.00.

## SIXTH CAUSE OF ACTION
### Against Gorsk Supplies, Domovsky, and the Management Defendants
### (Common Law Fraud)

396.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

397.    Gorsk Supplies, Domovsky, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

398.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Gorsk Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Gorsk Supplies was not lawfully licensed as they knowingly falsified

the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

399. Gorsk Supplies, Domovsky, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Gorsk Supplies that were not compensable under New York no-fault insurance laws.

400. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by Gorsk Supplies, Domovsky, and the Management Defendants.

401. Gorsk Supplies, Domovsky, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

402. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Gorsk Supplies, Domovsky, and the Management Defendants**
**(Unjust Enrichment)**

403. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

404.    As set forth above, Gorsk Supplies, Domovsky, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

405.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Gorsk Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

406.    Gorsk Supplies, Domovsky, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Gorsk Supplies, Domovsky, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

407.    Gorsk Supplies, Domovsky, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

408.    By reason of the above, Gorsk Supplies, Domovsky, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $41,000.00.

## EIGHTH CAUSE OF ACTION
### Against Guseyn Supplies, Kuperman, and the Management Defendants
### (Common Law Fraud)

409.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

410.    Guseyn Supplies, Kuperman, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

411.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Guseyn Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Guseyn Supplies was not lawfully licensed as they knowingly

falsified the business address and owner information on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

412.    Guseyn Supplies, Kuperman, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Guseyn Supplies that were not compensable under New York no-fault insurance laws.

413.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted by Guseyn Supplies, Kuperman, and the Management Defendants.

414.    Guseyn Supplies, Kuperman, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

415.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Guseyn Supplies, Kuperman, and the Management Defendants**
**(Unjust Enrichment)**

416.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

417.    As set forth above, Guseyn Supplies, Kuperman, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

418.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Guseyn Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

419.    Guseyn Supplies, Kuperman, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Guseyn Supplies, Kuperman, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

420.    Guseyn Supplies, Kuperman, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

421.    By reason of the above, Guseyn Supplies, Kuperman, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $61,000.00.

## TENTH CAUSE OF ACTION
### Against Sarat Supplies, Gozakishvili, and the Management Defendants
### (Common Law Fraud)

422.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

423.    Sarat Supplies, Gozakishvili, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

424. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Sarat Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Sarat Supplies was not lawfully licensed as they knowingly falsified

the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

425.     Sarat Supplies, Gozakishvili, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Sarat Supplies that were not compensable under New York no-fault insurance laws.

426.     Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,000.00 pursuant to the fraudulent bills submitted by Sarat Supplies, Gozakishvili, and the Management Defendants.

427.     Sarat Supplies, Gozakishvili, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

428.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Sarat Supplies, Gozakishvili, and the Management Defendants**
**(Unjust Enrichment)**

429.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

430. As set forth above, Sarat Supplies, Gozakishvili, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

431. When Liberty Mutual paid the bills and charges submitted by or on behalf of Sarat Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

432. Sarat Supplies, Gozakishvili, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Sarat Supplies, Gozakishvili, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

433. Sarat Supplies, Gozakishvili, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

434. By reason of the above, Sarat Supplies, Gozakishvili, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $12,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Sarvat Supplies, Pelts, and the Management Defendants**
**(Common Law Fraud)**

435. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

436. Sarvat Supplies, Pelts, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

437. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Sarvat Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Sarvat Supplies was not lawfully licensed as they knowingly

falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

438. Sarvat Supplies, Pelts, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Sarvat Supplies that were not compensable under New York no-fault insurance laws.

439. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $11,000.00 pursuant to the fraudulent bills submitted by Sarvat Supplies, Pelts, and the Management Defendants.

440. Sarvat Supplies, Pelts, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

441. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Sarvat Supplies, Pelts, and the Management Defendants**
**(Unjust Enrichment)**

442. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

443. As set forth above, Sarvat Supplies, Pelts, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

444.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Sarvat Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

445.    Sarvat Supplies, Pelts, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Sarvat Supplies, Pelts, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

446.    Sarvat Supplies, Pelts, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

447.    By reason of the above, Sarvat Supplies, Pelts, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $11,000.00.

**FOURTEENTH CAUSE OF ACTION**
**Against Zastava Supplies, Bezborodov, and the Management Defendants**
**(Common Law Fraud)**

448.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

449.    Zastava Supplies, Bezborodov, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

450.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial

gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Zastava Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Zastava Supplies was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

451.    Zastava Supplies, Bezborodov, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Zastava Supplies that were not compensable under New York no-fault insurance laws.

452.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $63,000.00 pursuant to the fraudulent bills submitted by Zastava Supplies, Bezborodov, and the Management Defendants.

453.    Zastava Supplies, Bezborodov, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

454.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Zastava Supplies, Bezborodov, and the Management Defendants
### (Unjust Enrichment)

455.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

456.    As set forth above, Zastava Supplies, Bezborodov, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

457. When Liberty Mutual paid the bills and charges submitted by or on behalf of Zastava Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

458. Zastava Supplies, Bezborodov, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Zastava Supplies, Bezborodov, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

459. Zastava Supplies, Bezborodov, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

460. By reason of the above, Zastava Supplies, Bezborodov, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $63,000.00.

**SIXTEENTH CAUSE OF ACTION**
**Against Atlantic Supply, Dodson, and the Management Defendants**
**(Common Law Fraud)**

461. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

462. Atlantic Supply, Dodson, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

463. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial

gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Atlantic Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Atlantic Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

127

464.    Atlantic Supply, Dodson, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Atlantic Supply that were not compensable under New York no-fault insurance laws.

465.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $102,000.00 pursuant to the fraudulent bills submitted by Atlantic Supply, Dodson, and the Management Defendants.

466.    Atlantic Supply, Dodson, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

467.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Atlantic Supply, Dodson, and the Management Defendants
### (Unjust Enrichment)

468.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

469.    As set forth above, Atlantic Supply, Dodson, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

470.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Atlantic Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

471.    Atlantic Supply, Dodson, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Atlantic Supply, Dodson, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

472.    Atlantic Supply, Dodson, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

473.    By reason of the above, Atlantic Supply, Dodson, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $102,000.00.

## EIGHTEENTH CAUSE OF ACTION
### Against Baltic Supply, Bobrytsky, and the Management Defendants
### (Common Law Fraud)

474.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

475.    Baltic Supply, Bobrytsky, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

476.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent

Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Baltic Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Baltic Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

476.	Baltic Supply, Bobrytsky, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort

to induce Liberty Mutual to pay charges submitted through Baltic Supply that were not compensable under New York no-fault insurance laws.

478.   Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,000.00 pursuant to the fraudulent bills submitted by Baltic Supply, Bobrytsky, and the Management Defendants.

479.   Baltic Supply, Bobrytsky, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

480.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Baltic Supply, Bobrytsky, and the Management Defendants
### (Unjust Enrichment)

481.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

482.   As set forth above, Baltic Supply, Bobrytsky, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

483.   When Liberty Mutual paid the bills and charges submitted by or on behalf of Baltic Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

484.   Baltic Supply, Bobrytsky, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Baltic

Supply, Bobrytsky, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

485.    Baltic Supply, Bobrytsky, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

486.    By reason of the above, Baltic Supply, Bobrytsky, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $58,000.00.

## TWENTIETH CAUSE OF ACTION
### Against Vittel Supplies, Fedorenko, and the Management Defendants
### (Common Law Fraud)

487.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

488.    Vittel Supplies, Fedorenko, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

489.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through

collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Vittel Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Vittel Supplies was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9".

490.    Vittel Supplies, Fedorenko, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Vittel Supplies that were not compensable under New York no-fault insurance laws.

491.     Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000.00 pursuant to the fraudulent bills submitted by Vittel Supplies, Fedorenko, and the Management Defendants.

492.     Vittel Supplies, Fedorenko, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

493.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Vittel Supplies, Fedorenko, and the Management Defendants**
**(Unjust Enrichment)**

494.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

495.     As set forth above, Vittel Supplies, Fedorenko, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

496.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Vittel Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

497.     Vittel Supplies, Fedorenko, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Vittel Supplies, Fedorenko, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

498.    Vittel Supplies, Fedorenko, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

499.    By reason of the above, Vittel Supplies, Fedorenko, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $7,000.00.

### TWENTY-SECOND CAUSE OF ACTION
### Against Xpert Supply, Baltachi, and the Management Defendants
### (Common Law Fraud)

500.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

501.    Xpert Supply, Baltachi, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

502.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained

photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Xpert Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Xpert Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10".

503.    Xpert Supply, Baltachi, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Xpert Supply that were not compensable under New York no-fault insurance laws.

504.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and

136

property by reason of the above-described conduct in that it has paid at least $35,000.00 pursuant to the fraudulent bills submitted by Xpert Supply, Baltachi, and the Management Defendants.

505.    Xpert Supply, Baltachi, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

506.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
### Against Xpert Supply, Baltachi, and the Management Defendants
### (Unjust Enrichment)

507.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

508.    As set forth above, Xpert Supply, Baltachi, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

509.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Xpert Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

510.    Xpert Supply, Baltachi, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Xpert Supply, Baltachi, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

511.    Xpert Supply, Baltachi, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

512.    By reason of the above, Xpert Supply, Baltachi, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $35,000.00.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Zarev Supplies, Gordon, and the Management Defendants**
**(Common Law Fraud)**

513.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

514.    Zarev Supplies, Gordon, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

515.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the

Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Zarev Supplies had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Zarev Supplies was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11".

516.    Zarev Supplies, Gordon, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Zarev Supplies that were not compensable under New York no-fault insurance laws.

517.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,000.00 pursuant to the fraudulent bills submitted by Zarev Supplies, Gordon, and the Management Defendants.

518.    Zarev Supplies, Gordon, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

519.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Zarev Supplies, Gordon, and the Management Defendants
### (Unjust Enrichment)

520.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

521.    As set forth above, Zarev Supplies, Gordon, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

522.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Zarev Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

523.    Zarev Supplies, Gordon, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Zarev Supplies, Gordon, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

524.    Zarev Supplies, Gordon, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

525.    By reason of the above, Zarev Supplies, Gordon, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $19,000.00.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Argo Equipment, Tesler, and the Management Defendants**
**(Common Law Fraud)**

526.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

527.    Argo Equipment, Tesler, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

528.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected

141

the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Argo Equipment had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Argo Equipment was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12".

529.    Argo Equipment, Tesler, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Argo Equipment that were not compensable under New York no-fault insurance laws.

530.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by Argo Equipment, Tesler, and the Management Defendants.

531.    Argo Equipment, Tesler, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

532. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Argo Equipment, Tesler, and the Management Defendants
### (Unjust Enrichment)

533. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

534. As set forth above, Argo Equipment, Tesler, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

535. When Liberty Mutual paid the bills and charges submitted by or on behalf of Argo Equipment for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

536. Argo Equipment, Tesler, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Argo Equipment, Tesler, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

537. Argo Equipment, Tesler, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

538. By reason of the above, Argo Equipment, Tesler, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $41,000.00.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Omega Equipment, Dombrovsky, and the Management Defendants
### (Common Law Fraud)

539.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

540.    Omega Equipment, Dombrovsky, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

541.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected

the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Omega Equipment had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Omega Equipment was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "13".

542. Omega Equipment, Dombrovsky, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Omega Equipment that were not compensable under New York no-fault insurance laws.

543. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $34,000.00 pursuant to the fraudulent bills submitted by Omega Equipment, Dombrovsky, and the Management Defendants.

544. Omega Equipment, Dombrovsky, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

545.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Omega Equipment, Dombrovsky, and the Management Defendants
### (Unjust Enrichment)

546.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

547.     As set forth above, Omega Equipment, Dombrovsky, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

548.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Omega Equipment for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

549.     Omega Equipment, Dombrovsky, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Omega Equipment, Dombrovsky, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

550.     Omega Equipment, Dombrovsky, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

551.     By reason of the above, Omega Equipment, Dombrovsky, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $34,000.00.

**THIRTIETH CAUSE OF ACTION**
**Against Prompt Direct Supply, Karon, and the Management Defendants**
**(Common Law Fraud)**

552.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

553.    Prompt Direct Supply, Karon, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

554.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected

the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Prompt Direct Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Prompt Direct Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14".

555.    Prompt Direct Supply, Karon, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Prompt Direct Supply that were not compensable under New York no-fault insurance laws.

556.    Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills submitted by Prompt Direct Supply, Karon, and the Management Defendants.

557.    Prompt Direct Supply, Karon, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

558.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-FIRST CAUSE OF ACTION**
**Against Prompt Direct Supply, Karon, and the Management Defendants**
**(Unjust Enrichment)**

559.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

560.     As set forth above, Prompt Direct Supply, Karon, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

561.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Prompt Direct Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

562.     Prompt Direct Supply, Karon, and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Prompt Direct Supply, Karon, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

563.     Prompt Direct Supply, Karon, and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

564.     By reason of the above, Prompt Direct Supply, Karon, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $72,000.00.

**THIRTY-SECOND CAUSE OF ACTION**
**Against Affordable Supply and the Management Defendants**
**(Common Law Fraud)**

565.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

566.    Affordable Supply and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of fraudulent charges seeking payment for Fraudulent Equipment.

567.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected

the HCPCS Codes contained in the bills submitted to Liberty Mutual when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Affordable Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Affordable Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15".

568. Affordable Supply and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Affordable Supply that were not compensable under New York no-fault insurance laws.

569. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by Affordable Supply and the Management Defendants.

570. Affordable Supply and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

571.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-THIRD CAUSE OF ACTION
### Against Affordable Supply and the Management Defendants
### (Unjust Enrichment)

572.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

573.     As set forth above, Affordable Supply and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

574.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Affordable Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

575.     Affordable Supply and the Management Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Affordable Supply and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

576.     Affordable Supply and the Management Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

577.     By reason of the above, Affordable Supply and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $41,000.00.


**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual

Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a Judgment be entered in their favor:

A.       On the First Cause of Action against ABV Supplies, Affordable Supply, Argo Equipment, Atlantic Supply, Baltic Supply, Gorsk Supplies, Guseyn Supplies, Omega Equipment, Prompt Direct Supply, Sarat Supplies, Sarvat Supplies, Vittel Supplies, Xpert Supply, Zarev Supplies, and Zastava Supplies for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that ABV Supplies, Affordable Supply, Argo Equipment, Atlantic Supply, Baltic Supply, Gorsk Supplies, Guseyn Supplies, Omega Equipment, Prompt Direct Supply, Sarat Supplies, Sarvat Supplies, Vittel Supplies, Xpert Supply, Zarev Supplies, and Zastava Supplies have no right to receive payment for any pending bills submitted to Liberty Mutual;

B.       On the Second Cause of action against the Paper Owner Defendants and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but more than $700,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.       On the Third Cause of Action against the Paper Owner Defendants and the Management Defendant for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but more than $700,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.       On the Fourth Cause of Action against ABV Supplies, Beliakouskaya, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $100,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against ABV Supplies, Beliakouskaya, and the Management Defendants for more than $100,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Gorsk Supplies, Domovsky, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $41,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Gorsk Supplies, Domovsky, and the Management Defendants for more than $41,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Guseyn Supplies, Kuperman, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $61,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.     On the Ninth Cause of Action against Guseyn Supplies, Kuperman, and the Management Defendants for more than $61,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.     On the Tenth Cause of Action against Sarat Supplies, Gozakishvili, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $12,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.     On the Eleventh Cause of Action against Sarat Supplies, Gozakishvili, and the Management Defendants for more than $12,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.    On the Twelfth Cause of Action against Sarvat Supplies, Pelts, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $11,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.    On the Thirteenth Cause of Action against Sarvat Supplies, Pelts, and the Management Defendants for more than $11,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.    On the Fourteenth Cause of Action against Zastava Supplies, Bezborodov, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $63,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.    On the Fifteenth Cause of Action against Zastava Supplies, Bezborodov, and the Management Defendants for more than $63,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.    On the Sixteenth Cause of Action against Atlantic Supply, Dodson, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $102,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against Atlantic Supply, Dodson, and the Management Defendants for more than $102,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.    On the Eighteenth Cause of Action against Baltic Supply, Bobrytsky, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be

determined at trial but in excess of $58,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Baltic Supply, Bobrytsky, and the Management Defendants for more than $58,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Vittel Supplies, Fedorenko, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $7,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Vittel Supplies, Fedorenko, and the Management Defendants for more than $7,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Xpert Supply, Baltachi, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $35,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.      On the Twenty-Third Cause of Action against Xpert Supply, Baltachi, and the Management Defendants for more than $35,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

X.      On the Twenty-Fourth Cause of Action against Zarev Supply, Gordon, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $19,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.    On the Twenty-Fifth Cause of Action against Zarev Supply, Gordon, and the Management Defendants for more than $19,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.    On the Twenty-Sixth Cause of Action against Argo Equipment, Tesler, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $41,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA.    On the Twenty-Seventh Cause of Action against Argo Equipment, Tesler, and the Management Defendants for more than $41,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

BB.    On the Twenty-Eighth Cause of Action against Omega Equipment, Dombrovsky, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $34,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.    On the Twenty-Ninth Cause of Action against Omega Equipment, Dombrovsky, and the Management Defendants for more than $34,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

DD.    On the Thirtieth Cause of Action against Prompt Direct Supply, Karon, and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $72,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.    On the Thirty-First Cause of Action against Prompt Direct Supply, Karon, and the Management Defendants for more than $72,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.   On the Thirtieth-Second Cause of Action against Affordable Supply and the Management Defendants for compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $41,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

GG.   On the Thirty-Third Cause of Action against Affordable Supply and the Management Defendants for more than $41,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  September 29, 2025
         Uniondale, New York

RIVKIN RADLER LLP

By:       /s/ *Barry I. Levy*
          Barry I. Levy, Esq.
          Frank P. Tiscione, Esq.
          Philip P. Nash, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*